STEAGALL, Justice.
Nine individual plaintiffs[1] and the Lake Martin/Alabama Power Licensee Association, Inc. (hereinafter “Licensees”) sued Alabama Power Company, Inc., and its wholly-owned subsidiary, Alabama Property Company, based on 12 counts: 1) fraudulent inducement; 2) fraudulent misrepresentation and deceit; 3) third-party beneficiary interest; 4) violation of state law (failure by Alabama Power to apply to the Alabama Public Service Commission for approval of the sale of licensed lots); 5) coercion and duress; 6) breach of requirement of good faith and fair dealing; 7) constructive fraud; 8) violation of federal law; 9) equitable estoppel; 10) irrevocable license; 11) conspiracy; and 12) violation of state law (improper accounting by Alabama Power of income received from the sale of the licensed property).
Although the plaintiffs sought class action status representing all those who entered into license agreements for recreational sites along “certain Alabama lakes,” including Lake Martin and Lake Jordan (a class of roughly 2500 members), that request was denied. The trial court entered summary judgment on all but counts 4 and 6 of the Licensees’ complaint and made that judgment final pursuant to Rule 54(b), A.R.C.P. It is from that judgment that they appeal.
Lake Martin and Martin Dam were built by Alabama Power in the 1920’s and were operated for 50 years by Alabama Power pursuant to a license issued by the Federal Energy Regulatory Commission (“FERC”) (or its predecessor) for an initial term of 50 years. During that 50-year period, Alabama Power lands bordering Lake Martin were included within FERC’s definition of the “project lands” covered by the license and, therefore, could not be sold.
About 1948, Alabama Power began a positive program of recreational development along Lake Martin, the primary emphasis being the licensing of shoreline cottage sites. These sites were considered part of the Martin Dam Project and, as such, were always included as “project property” in computing rate base charges in setting utility rates. The Recreational Site Agreements between the Licensees and Alabama Power are all substantially the same, and they state that each Licensee asked for and received from Alabama Power permission to build vacation homes on the lots Alabama Power owns. Alabama Power granted such permission for an agreed-upon term of 15 years, or for five years with two five-year renewal options, subject to certain specified conditions contained in the written license agreements. One of those conditions was the requirement that either at the termination or the *407 expiration of a license, the licensee must remove his improvements within 90 days and restore the property to its prior condition. Licensees wishing to renew their licenses after the initial 15-year period were normally allowed to do so, but not always on the same terms. Over the years, Alabama Power increased the amount of annual rent charged for new licenses and renewals of old licenses. By 1980, there were approximately 2,755 recreational cottage sites under existing license agreements.
When FERC renewed Alabama Power’s license in 1981, it determined, in assessing the adequacy of Alabama Power’s recreational plans, that the licensing of lots to private individuals for vacation homes did not constitute “public recreation” facilities. (Only those facilities open and available to the general public, such as parks, picnic grounds, boat ramps, etc., were considered recreational by the FERC staff.) Accordingly, Alabama Power amended its application and deleted the licensed lots from the definition of the “project lands” relating to Martin Dam.
In 1985, Alabama Power notified certain licensees that they could purchase the sites upon which their houses were located. The notification letter stated that if they did not elect to purchase within 90 days, their license, upon expiration, would be subject to a year-to-year renewal at a rental rate to be determined annually. In instances of genuine hardship, terms of licenses would be modified on a case-by-case basis. Appraisals for the property included a 15% discount in recognition of a “buffer” control easement of 30 feet from the waterline retained by Alabama Power as required by FERC.
I.
Fraud and Misrepresentation Counts (1, 2, and 7)
The basis of the Licensees’ argument is that Alabama Power represented that the leased property could not and would not be sold; that the lots would always be leased; that the lease rates would be nominal and/or minimal; that all lessees could lease for an indefinite time; and that the lot leasing program was a “not for profit” operation. They further argue that Alabama Power’s failure to notify the Licensees of its intent to sell the property constitutes subsequent fraud on them.
Specifically, the Licensees argue that R.L. Scott, the Alabama Power official in charge of the lakeshore program, gave numerous speeches promoting the lake regions to a variety of groups in which he made it understood that the program was not a “for profit” operation, that the lots would never be sold, and that license renewal fees would be modest. They refer to one presentation he made in 1959 in which he stated that the “annual rental is nominal” and that the “rates merely cover the cost.” They also allege that he said another time in 1970 that “our lessees know that we are not trying to gouge them and they gratefully accept our program.”
Of the eight individual plaintiffs, five testified either that they never spoke to an Alabama Power representative at all before acquiring their licenses or that they spoke with an Alabama Power representative but had no discussions regarding future rentals. The other three admitted that they had no evidence that the Alabama Power representative was intentionally attempting to mislead or deceive them in any way.
The representation by a defendant sufficient to constitute fraud must be of a material existing fact. Army Aviation Center Fed. Credit Union v. Poston, 460 So.2d 139 (Ala.1984). Where, as in this case, the alleged representation pertains to a future event, the plaintiff must further prove that, at the time the representation was made, the defendant had an intention not to perform, and the representation must have been made with the intent not to perform. Army Aviation, supra.
None of the eight individual plaintiffs contended that Alabama Power made representations to them about future rentals or that Alabama Power intentionally attempted to mislead or deceive them in any way. Furthermore, the license agreement is explicitly subject to Alabama Power’s *408 initial 50-year license with FERC, as well as to any subsequent licenses with FERC:
“Licensor’s use of Martin Dam and Reservoir, on which the recreational lot which is the subject of this agreement is located, is governed by Federal Power Commission License for Martin Dam (FPC Project No. 349 — Alabama). Such license was for a term of fifty (50) years (beginning on June 1923 and ending on June 9, 1973) and thereafter on a year to year basis until arrangements for reli-eensing or other disposition are made. Licensor has applied for a renewal or extension of such license and the Federal Power Commission has such renewal or extension under consideration. The terms hereof, therefore, are made expressly subject to the action that the Federal Power Commission may take on such application for renewal or extension.” (Emphasis added.)
The agreement further stipulates that, upon the termination or expiration of the license, the licensee shall have 90 days to remove all structures and restore the premises to the same condition as prior to the erection of any buildings or structures.
The Licensees have presented no evidence that they were told that future rentals or renewals would be on a non-profit basis. In fact, none of the eight plaintiffs claims that the alleged non-profit statements were untrue at the time they were made. Rather, one plaintiff, Ronald W. Taylor, admitted that Scott was not trying to deliberately deceive him and that “I don’t think [the current license program] was conceived until just the last few years ... or the last time that Alabama Power got a lease to operate their dam.” And Walter Stevenson testified that Scott told him he would be able to renew the lease under similar conditions but that “there might be some minor adjustment to the costs of it.” Taylor also testified that he was told “there might be a slight increase in the price, but it will be nominal.”
Finally, the Licensees’ reliance upon the alleged misrepresentations must have been reasonable under the circumstances. Taylor v. Moorman Manufacturing Co., 475 So.2d 1187 (Ala.1985). It would have been unreasonable for a licensee to assume he could renew his license indefinitely without a proportionate increase in the yearly rate in contradiction of the provision expressly making the license agreements subject to Alabama Power’s license with FERC.
Finally, there is no basis for a constructive fraud claim, because there is no evidence of a false statement, without which there can be no fraud, constructive or actual.
II.
Equitable Estoppel and Irrevocable License Counts
(9 and 10)
Essentially, the Licensees contend that Alabama Power reneged on a promise not to sell the licensed lots.
“ ‘ * * * An essential element of an es-toppel in pais is a false representation, or a concealment of material facts, upon which another has been induced to act to his prejudice. The representation or concealment must, in all ordinary cases, have reference to past or present facts. A mere promise of something to be done in the future is not such a representation or concealment. One’s failure to perform a promise is a very different thing from his denial of a state of facts which he had previously held out as in existence.’ ”
Carter v. Stringfellow, 293 Ala. 525, 528, 306 So.2d 273, 276 (1975) (citation omitted) (emphasis added).
There is no evidence that Scott’s representation to Taylor that any future increases of rent would be nominal was made with an intention not to honor that representation. Furthermore, sales of the lots were not possible until after the expiration of Alabama Power’s initial 50-year license with FERC and FERC’s reclassification of the lots. The Licensees have produced no evidence of concealment or misrepresentation with regard to past or *409 present material facts and, thus, no basis for equitable estoppel.
With regard to the Licensees’ irrevocable license argument, they specifically agreed that both parties would have the right to terminate the agreements upon 90 days’ notice and that the licenses were for periods of 15 years, renewable at their option. The agreements were signed before improvements were made. Thus, expressly limited, these licenses cannot now be termed “irrevocable.”
III.
Third-Party Beneficiary Count
(3)
The Licensees assert that they were third-party beneficiaries to agreements whereby Alabama Power, as a public utility, obtained its lands for public use by condemnation or threat of condemnation. “A person not a party to a contract may sue one of the parties for breach of the contract only if the contract was intended for the direct benefit of persons ..., not their incidental benefit.” Davidson v. Marshall-DeKalb Elec. Co-Op., 495 So.2d 1058, 1060 (Ala.1986) (citations omitted).
As Alabama Power points out, those agreements by which it acquired the land for Martin Dam and the reservoirs were entered into in the 1920’s, at least 25 years before any recreational lots were licensed at Lake Martin and 40 to 50 years before these plaintiffs entered into their licensing agreements. The fact that these plaintiffs have subsequently acquired licenses to use the recreational lots does not establish that they were intended to be direct beneficiaries of the agreements.
IV.
Coercion, Duress, and Conspiracy Counts (5 and 11)
The plaintiffs seek to avoid being held to the terms of the new policy adopted in 1985 and allege that any agreement to abide by that 1985 policy is the result of duress. For performance under a contract to be excused due to duress, the plaintiff must prove three essential elements: 1) wrongful acts or threats; 2) financial distress caused by the wrongful acts or threats; and 3) the absence of any reasonable alternative to the terms presented by the wrongdoer. International Paper Co. v. Whilden, 469 So.2d 560 (Ala.1985). The Licensees have provided no facts to support a finding of any of those elements and thus to withstand summary judgment. The worst possible alternative to the terms of Alabama Power’s proposal is removal of the improvements from a lot at the expiration of the lease, something that the Licensees expressly anticipated and agreed to in their contracts.
The Licensees further contend that Alabama Power conspired with Alabama Property to remove the licensed lots from the rate base computation and modified its policy and procedure to their detriment after having maintained that the sites were not for sale, were operated on a non-profit basis, and were to have only nominal license fee increases. “A civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. The gist of the action is not the conspiracy alleged, but the wrong committed. O’Dell v. State [ex rel. Patterson], 270 Ala. 236, 117 So.2d 164 (1959).” Sadie v. Martin, 468 So.2d 162, 165 (Ala.1985).
At the time the alleged “not for sale” statements were made, Alabama Power was under its 50-year contract with FERC, and the lots could not be sold. So, any statements to that effect were not untrue. Moreover, after the expiration of the 15-year license agreements that were on a non-profit basis, Alabama Power was clearly within its rights to establish new rates based upon different circumstances. By its definition, a conspiracy requires an underlying unlawful or wrongful act, neither of which is present here.
V.
Violation of Federal Law Count
(8)
The Licensees argue that they were given insufficient notice of Alabama Power’s proposal to sell or otherwise convey the *410 property in and around the Martin Dam Project. As Alabama Power notes, the complaint fails to state any facts showing how or why the notice was deficient. In fact, the Licensees concede in their brief that “[c]ount VIII standing alone states [no] cause of action,” and that count 8 is “only used to support the remaining state claims and no specific relief is sought for violation of federal regulations.”
VI.
Violation of State Law Count
(12)
There was no motion for summary judgment pending as to count 12 when the trial court entered summary judgment on all but counts 4 and 6. Thus, the summary judgment is due to be reversed as to count 12.
In conclusion, after reviewing the allegations in all the appealed counts and the facts submitted on each count, we do not find a scintilla of evidence to support, counts 1, 2, 3, 5, 7, 8, 9, 10, and 11, and we affirm the summary judgment as to them. Summary judgment as to count 12 is reversed and the case is remanded.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.

. One of the individual plaintiffs moved and was voluntarily dismissed from the suit.