**PICKER INTERNATIONAL, INC.,**
Plaintiff–Appellant,

v.

**Daniel W. PARTEN, individually and d/b/a PPX Imaging; John Parten, d/b/a PPX Imaging, Defendants–Appellees.**

No. 90–7756.

United States Court of Appeals,
Eleventh Circuit.

July 11, 1991.

Waller, Landsden, Dortch & Davis, Joseph A. Woodruff, Nashville, Tenn., for plaintiff-appellant.

Balch & Bingham, Alan T. Rogers and Stephen E. Whitehead, Birmingham, Ala., for Daniel W. Parten.

Engel, Hairston & Johanson, P.C., William B. Hairston, III and William B. Hairston, Jr., Birmingham, Ala., for John Parten.

Before JOHNSON and COX, Circuit Judges, and MORGAN, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Picker International, Inc., plaintiff in the case below, appeals the district court's

grant of directed verdicts in favor of John Parten, Daniel Parten, and PPX Imaging on claims of breach of a covenant not to compete, breach of a confidentiality agreement, and fraud.

## I. BACKGROUND OF THE CASE

Picker International, Inc., ("Picker"), appellant in this case, is a New York corporation with its principal place of business in Ohio. Picker manufactures, sells, installs, and services radiological diagnostic equipment such as angiocons, *i.e.,* machines which provide moving images of the human circulatory system. Picker maintains a field office in Birmingham through which it services most of the Picker equipment in Alabama.

John Parten worked as a "field service engineer," or repairman, at Picker from 1959 until 1988 with the exception of a three-and-a-half year period during which he worked elsewhere. In the spring of 1988, Picker decided it needed to reduce its work force in the Birmingham office and asked John Parten to take early retirement. He retired in June 1988. His son, Daniel Parten, also worked in equipment repair at Picker. Daniel Parten began working at Picker in 1982. At the time he was hired, he executed an "Employee Invention and Confidential Information Agreement."[1] Later, in April 1984, he also signed a "Service Engineer Confidentiality Agreement."[2] As part of his duties at Picker, Daniel Parten serviced the angiocon at the University of Alabama at Birmingham ("UAB"). He worked at Picker for approximately six years, quitting in September 1988.

During the summer of 1988, after John Parten was unable to find employment with another medical equipment service company in the Birmingham area, he decided to start his own business. On July 18, he placed his name on UAB's vendor list. On August 2, he submitted a bid to UAB for a one-year service contract on the angiocon to begin in September 1988 for $50,400. Picker's bid was $61,526. John Parten was awarded the contract. On September 1, John and Daniel Parten formed a partnership called "PPX Imaging." On September 2, Daniel Parten resigned from Picker and went to work with his father at PPX. On September 6, Daniel Parten went through an exit interview with his supervisor at Picker and signed the "Termination Agreement" portion of "Employee Invention and Confidential Information Agreement" he had executed in 1982, certifying that he had returned to Picker all price lists, blueprints, manuals and other materials which Picker had entrusted to him. His supervisor signed a "termination checklist" in which he acknowledged receipt of all Picker tools and other property in Daniel Parten's possession.

On October 31, 1988, after becoming aware that Daniel Parten was working on the UAB angiocon, corporate counsel for Picker wrote to Daniel Parten, charging him with disclosing confidentialities and vi-

---

**1.** That agreement contains the following provisions:

> In consideration of my employment or continuance of my existing employment by Picker International or by any corporation in which Picker International owns an interest or which owns an interest in Picker International (all referred to in this agreement as "Picker"):
> (1) I will not, without Picker's written consent, disclose or use at any time, either during or after my employment, any secret or confidential information relating to Picker's business unless required by the discharge of my duties to Picker.
> . . . .
> (4) Upon termination of my employment I will promptly deliver to Picker all price lists, customer lists, plans, drawings, blue prints,

manuals, letters, notes, notebooks, reports and copies thereof relating to Picker's business as well as any other property entrusted to me by Picker.

**2.** The 1984 agreement states:

> I acknowledge that by virtue of my employment I will acquire information concerning PICKER INTERNATIONAL's operations, suppliers and customers, and that such information constitutes valuable and confidential information. I agree that for a period of one (1) year from the date of termination of my employment with PICKER INTERNATIONAL, I shall not directly or indirectly service any PICKER INTERNATIONAL equipment that I did in fact service at any location to which I was assigned during my employment with PICKER INTERNATIONAL.

olating the covenant not to compete contained in the 1984 agreement. The counsel demanded written assurance from Daniel Parten that he would not violate his agreements with Picker in the future. Daniel Parten wrote a letter on November 10 to Picker's counsel, stating that he intended to abide by the agreements. He then informed UAB that he could not personally service the angiocon. Nevertheless, he continued to service it.

When PPX's one-year contract with UAB expired in August 1989, both Picker and PPX placed bids. Picker bid $45,000; PPX bid $47,880. Despite Picker's lower bid, UAB awarded the contract to PPX at the request of a UAB radiology professor who had been displeased with Picker's service but pleased with PPX's. Following loss of the bid, Picker filed suit in district court against Daniel Parten, John Parten, and PPX, premising jurisdiction on diversity. Picker sought injunctive relief and damages, alleging breach of Daniel's agreements and fraud. In August 1990, the parties filed cross motions for summary judgment which were later denied. The case proceeded to trial in September 1990. At the conclusion of the evidence, the court granted the defendants' motions for directed verdicts. Picker now appeals.

## II. ANALYSIS

The standard by which this Court reviews a district court's disposition of a motion for directed verdict was articulated in *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable [persons] could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence op-

posed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. (footnote omitted).

A federal court sitting in diversity applies the substantive law of the state in which it sits, including that state's choice of law. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Alabama's law of conflicts applies the *lex loci contractus* and *lex loci delicti. Morris v. SSE, Inc.,* 912 F.2d 1392, 1396 (11th Cir.1990). Because the agreements were entered into in Alabama and the alleged fraud occurred in Alabama, Alabama law governs the substantive issues of the case.

### A. *Covenant not to Compete*

■ Contracts restraining employment are disfavored in Alabama by statute; such agreements are potentially void. *Nationwide Mut. Ins. Co. v. Cornutt,* 907 F.2d 1085, 1087 (11th Cir.1990). *See* Ala.Code § 8–1–1(a) (1984) ("Every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind otherwise than is provided by this section is to that extent void."). "Nevertheless, Alabama courts will enforce a noncompete agreement if it (1) falls within a statutory exception to the general prohibition, and (2) is reasonably limited as to territory, duration and subject matter." *Nationwide,* 907 F.2d at 1087 (footnotes

omitted). The applicable statutory exception in the case at bar is section 8–1–1(b), which provides that "an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city or part thereof so long as the ... employer carries on a like business therein." The validity of the covenant not to compete in the case at bar thus turns upon the second criteria outlined in *Nationwide, i.e.,* whether the covenant is "reasonably limited as to territory, duration and subject matter." *See Nationwide,* 907 F.2d at 1087.

The district court, in granting the defendants' motion for directed verdict, found *Chavers v. Copy Prods. Co., Inc.,* 519 So.2d 942 (Ala.1988), to be "a gray horse case or spotted cow case, meaning it's exactly like the case that is before the Court now." (R2:8). In *Chavers,* a photocopier technician and repairman left Copy Products Company in Mobile to enter a new business venture with his father. The new business provided maintenance, repair, and supply services to copier owners. Chavers' employment contract with Copy Products Company contained a covenant not to compete which provided that Chavers could not engage in any business similar to that of Copy Products Company within a seventy-five-mile radius of any Copy Products Company operation for a period of two years after termination. Copy Products Company had operations throughout southern Alabama, northwest Florida, and parts of Mississippi. The Alabama Supreme Court found this covenant void because it in effect operated as a "blanket" prohibition against Chavers' "working in any capacity in the copier service industry in a wide geographical area, due to the extensive scope of Copy Products' operations." *Id.* at 944. The court emphasized that working people "cannot be prevented from plying their trades by blanket post-employment restraints." *Id.* at 945.

The propriety of the district court's ruling in regard to the non-competition covenant in the case at bar thus hinges upon whether the covenant was such a blanket

prohibition, as it was in *Chavers,* that no reasonable juror could help but find in favor of the Partens. The two cases are superficially very similar; in both a repairman of highly sophisticated equipment leaves his employer to begin a new business with his father. The actual covenants, however, are very different. Whereas in *Chavers* the covenant precluded the repairman from working in the employer's industry in any manner over a broad geographical area, Parten's covenant merely precluded him from "servic[ing] any PICKER INTERNATIONAL equipment that [he] did in fact service at any location to which [he] was assigned during [his] employment with PICKER INTERNATIONAL." *See supra* n. 2. Parten's covenant clearly does not bar him from working on all radiological medical equipment in his geographic area; it does not even bar him from working on Picker equipment. Rather, it bars him from working on only those pieces of Picker equipment he was assigned to service during his employment. Trial testimony indicated that Picker has 213 customer sites in the service area of the Picker office in Birmingham. Parten worked at only 37 of these. Though UAB has the only angiocon in Alabama, Parten is free to work on Picker angiocons located in Nashville, Tennessee and Columbus, Georgia. Evidence admitted at trial indicated that he had in fact done so. Thus, the effect of Parten's covenant is not analogous to that of the repairman in *Chavers* because it is not a blanket prohibition against working in an industry over a wide geographic area.

■ Rather than applying *Chavers* as dispositive of the directed verdict motion, the district court should have asked, under the *Boeing* standard, whether there was "substantial evidence" presented which might lead fair-minded jurors to different conclusions on the issue of the reasonableness of the covenant as to "territory, duration and subject matter." *See Nationwide,* 907 F.2d at 1087. In order to be found reasonable under Alabama law, a covenant not to compete must meet four criteria: "(1) the employer has a protectable inter-

est; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; [and] (4) the restriction imposes no undue hardship." *DeVoe v. Cheatham*, 413 So.2d 1141, 1142 (Ala.1982).

■ First, an employer has a protectable interest "if an employee [was] in a position to gain confidential information, access to secret lists, or to develop a close relationship with clients." *Id.* at 1143. "A protectable interest can also arise from the employer's investment in its employee, in terms of time, resources and responsibility." *Nationwide*, 907 F.2d at 1087–88 (citing *James S. Kemper & Co., Southeast, Inc. v. Cox & Assocs., Inc.*, 434 So.2d 1380, 1382 (Ala.1983)). Picker claims protectable interests in three areas. First, it claims that Parten had what amounted to trade secret information in the form of diagnostic software, design information, and technical manuals. Picker claims that it took steps to protect its secrets through confidentiality agreements with employees and through its policy of recovering manuals from customers when they ceased to be customers. Daniel Parten presented testimony, however, showing that in fact Picker did not always recover the manuals and that even the technical service manuals which were intended only for employee use were often kept at the site of the equipment and thus were readily available to anyone who might enter a customer's offices. This testimony was not refuted. Second, Picker claims that Picker provided Parten with the opportunity to develop close relationships with clients. Under Alabama case law, this opportunity to develop relationships with customers must be more than the incidental contact a simple laborer might have with the employer's customers. *See Booth v.*

*WPMI Television Co., Inc.*, 533 So.2d 209, 211 (Ala.1988); *Greenlee v. Tuscaloosa Office Prods., Inc.*, 474 So.2d 669, 671 (Ala. 1985). Opportunities for close customer relationships generally arise in positions involving sales or management activities. *See Booth*, 533 So.2d at 211; *Greenlee*, 474 So.2d at 671–72. Alabama courts, however, have not limited the employer's protectable interest in customer relationships to positions of sales and management. In the case at bar, Daniel Parten clearly developed a close relationship with the personnel at UAB. That relationship was the deciding factor in the award of the 1989–90 service contract to PPX.[3] Third, Picker claims it invested in Daniel Parten a great deal of training. Daniel Parten downplays the training as nothing more than short workshops that had little impact on his skills. Daniel Parten points out that he was working on certain pieces of Picker equipment long before he received any special training in regard to those pieces of equipment. Moreover, the workshops Daniel Parten attended were also attended by employees from companies other than Picker. When the evidence is viewed in the light most favorable to Picker, it is clear that a fair-minded juror might at least be able to find that Parten had the opportunity to develop a special or close relationship with UAB, one of Picker's customers, which clearly aided him in winning the service contract away from Picker. Therefore, substantial evidence exists demonstrating that Picker has a protectable interest.

Second, under *DeVoe* the covenant restriction must be reasonably related to the protection of Picker's interest. Parten was barred from servicing only the Picker

**3.** A professor of radiology who worked with the angiocon wrote a letter to a member of the UAB purchasing department after learning that Picker's bid for the 1989–90 angiocon service contract was $2,880 lower than that of PPX. He urged that PPX be awarded the contract, stating that Daniel Parten had "demonstrated special knowledge and ability to make the machine run properly" both while at Picker and then later at PPX. The letter contrasted Daniel Parten with the other Picker serviceman assigned to the angiocon who had apparently not been as success-

ful in working with the machine and who smoked in the angio lab. *See* Plaintiff's Exhibit no. 25. The letter clearly demonstrates that in the mind of the customer the Picker servicemen are not fungible. It was important enough to the UAB personnel to have a serviceman of demonstrated trustworthiness to pay $2,880 more for the service contract. If Picker had not put Daniel Parten in contact with UAB, he would not have had the opportunity to develop this relationship of trust with the UAB personnel.

equipment of customers he had served while employed by Picker. These are the customers with whom he had an opportunity to develop a special or close relationship. He was not barred from servicing the equipment of the Picker customers he had not personally served while working for Picker, nor was he barred from servicing the non-Picker equipment of the customers he had served while working for Picker or the Picker equipment he had not actually serviced at the sites where he had performed services. Thus, substantial evidence exists which would allow a fair-minded jury to conclude that the covenant was reasonably related to the protection of the interest.

■ Likewise, Parten's covenant must be also adjudged reasonable under the third prong of *DeVoe, i.e.,* in terms of time and place. As pointed out in *Nationwide,* the length of the prohibition may be geared to the length of the typical contract in the industry in question. *Nationwide,* 907 F.2d at 1088–89. In Parten's case, the covenant was to last one year, the same length of time that UAB's service contract lasted. Moreover, the place of enforcement is not in effect a blanket bar over a large geographic area as in *Chavers,* but consists of the places of business of the 37 Picker customers to whom Parten provided service while employed by Picker.[4] Picker points out that Parten could even service much of UAB's X-ray equipment manufactured by Picker and others, as long as he did not work on the angiocon or other equipment which he in fact serviced while he was a Picker employee. Moreover, Alabama courts have enforced covenants which endured even longer and covered a wider area than Parten's does. *See, e.g., Kemper, supra* (enforcing a covenant which lasted two years and covered the entire state of Alabama). It is thus clear that a fair-minded jury could also find the

restraint reasonable in terms of time and place.

Finally, in order for the covenant to be reasonable, it must not cause "undue hardship." As *Nationwide* points out, "[i]n nearly every Alabama 'undue hardship' case ..., enforcement of the restraint would have prohibited a worker from engaging in *the only trade he knew and could rely upon to support his dependents." Nationwide,* 907 F.2d at 1089 (emphasis in original). *See, e.g., Chavers,* 519 So.2d at 945 (stating "it is undisputed that the only trade [defendant] knows and by which he can support himself and his family is copier maintenance and repair"). In the case at bar, there was evidence presented indicating that Parten knows no other trade than servicing radiological diagnostic equipment. However, he is not prohibited by the covenant from plying that trade. He may still work on almost 85% of Picker equipment in Alabama during the year the covenant lasts, and he may also work on equipment manufactured by other companies. It is thus clear that a reasonable jury could not find that Parten's covenant created an undue hardship.

In sum, there was substantial evidence presented which could have led fair-minded jurors to find in favor of Picker on the reasonableness of the covenant not to compete. We therefore hold that the district court erred in granting the directed verdict in favor of the defendants on this issue.

### B. *Confidentiality Agreement*

■ The district court also granted a directed verdict in favor of the Partens on the claim that Daniel Parten had breached the 1982 agreement which requires that he not "disclose or use ... any secret or confidential information relating to Picker's business" and that he return all Picker property entrusted to him. *See supra* n. 1. The district court found that there had

4. Picker can produce Daniel Parten's service records only from 1986 to his date of termination in 1988. These records reveal that Daniel Parten provided service at 37 different sites during that time period. (R:4:419). Without proof that Daniel Parten provided service to other customers prior to 1986, Picker cannot

enforce the covenant as to any customer other than these 37. Our holding that substantial evidence exists demonstrating that the covenant was reasonable in terms of place is premised on the assumption that the covenant is limited to these 37 customers.

been no evidence presented to support this claim.

On appeal, Picker claims that Daniel Parten acquired information regarding the bidding process for the UAB angiocon service contract while at Picker and then used it to win the contract. Picker claims that he learned when Picker's contract would expire and "what to bid," though Picker does not explain whether Parten knew what to bid because he discovered the amount Picker intended to bid or whether he merely got a general feel for what would be a reasonable price while he worked at Picker. John Parten correctly points out, however, that the only testimony regarding acquisition of information about the bidding process concerned John, not Daniel Parten. John Parten testified that he, not Daniel, acquired information about bidding while employed at Picker. The possible breach of any confidentiality agreement Picker might have had with John Parten is not at issue in this case. Thus, the district court was correct in finding that the evidence supporting this claim was too insubstantial to avert a directed verdict.

■ Picker also argues that it presented evidence that Daniel Parten used trade secrets in his servicing of the UAB angiocon. In Picker's view, Daniel Parten used its manuals and the training it had provided him in working on the angiocon. In order for information to be defined as a trade secret in Alabama, however, there must exist "a substantial element of secrecy" in the information. *Drill Parts & Serv. Co., Inc. v. Joy Mfg. Co.*, 439 So.2d 43, 49 (Ala.1983). "[I]nformation common to others in the business ... or known to or easily obtainable by such others" cannot constitute a trade secret or confidential information. *Birmingham Television Corp. v. DeRamus*, 502 So.2d 761, 764 (Ala.Civ. App.1986). Picker's own employee testified that Picker often kept at the customer's office the technical manuals and publications Daniel Parten allegedly used in his work, suggesting that the information was constantly accessible to non-Picker employees. Moreover, testimony also shows that service on Picker equipment is sometimes

done by in-house repairmen rather than Picker repairmen, suggesting that information on how to repair at least some of the Picker equipment is common in the business. In addition, some of the training classes Daniel Parten attended were also attended by non-Picker employees. In fact, entities other than Picker provide classes in servicing Picker equipment. This testimony was unrefuted. The record does not reveal any "substantial evidence" indicating that the information Daniel Parten gained at Picker was not also in the possession of or accessible to individuals outside of the Picker organization. Consequently, the district court was correct in directing a verdict in favor of the Partens on this issue.

■ Picker also claimed that Daniel Parten breached his agreement by not returning all Picker property entrusted to him. Close to the time that the Partens began their new business, their accountant asked them to deliver a list of all inventory with which they were starting out. Daniel Parten gave the accountant a list of equipment and its retail prices. All of the equipment was used. On that list are items manufactured only by Picker. Picker claims it did not sell the Partens or PPX these items and therefore Daniel Parten must have taken them with him when he left Picker. The Partens, however, presented testimony showing that Daniel Parten had obtained one of the Picker manufactured items, the "625 changer rollers," from UAB. These were rollers which had been replaced in UAB's angiocon. UAB allowed Daniel Parten to keep the discarded rollers and attempt to recondition them and use them as spare parts. Another item listed was "receiver magazines," also a part used in angiocon servicing. The Partens presented testimony, however, that they had obtained these parts from an uncle who worked for Picker in Atlanta. The parts were rusted and were to be thrown away. With permission, the uncle retrieved them and later gave them to Daniel Parten. Moreover, the "SFD kit" in Daniel Parten's possession had similarly been given to him by a supervisor because it was defective and therefore not suitable for

Picker's use. The "micro aid" Daniel Parten listed, another piece of equipment used with the angiocon system, was on loan from UAB. The testimony explaining the source of these items was uncontroverted. The record does not reveal any "substantial evidence" indicating that the items on the inventory list were wrongfully taken from Picker. The district court therefore correctly directed a verdict in favor of the Partens on the claim that Daniel Parten had breached his agreement to return the property entrusted to him.

### C. *Fraud*

Picker finally claimed that Daniel Parten committed fraud when he represented to Picker in the November 10 letter that he would abide by the covenant not to compete in consideration of Picker's forbearance in filing a lawsuit. The district court directed a verdict in favor of the Partens on the fraud claim because the claim was based upon the non-competition agreement which the court considered void. In the district court's view, the only detriment Picker could have suffered as a result of Daniel Parten's breach of his promise in the November 10 letter was that Picker delayed seeking an injunction to stop him from servicing the UAB angiocon. But because the district court believed that no court would issue such an injunction under *Chavers*, it found that Picker suffered no detriment. Because we find the district court's application of *Chavers* to be incorrect, we must reexamine the directed verdict on the fraud claim.

■ In the November 10 letter, Daniel Parten in essence made a promise regarding his future acts. Under Alabama law, one alleging fraud pertaining to the non-performance of future acts must show that the defendant not only intended to deceive, but "at the time the representation was made, the defendant had an intention not to perform, and the representation must have been made with the intent not to perform." *Lake Martin/Ala. Power Licensee Ass'n, Inc. v. Alabama Power Co., Inc.*, 547 So.2d 404, 407 (Ala.1989). "The failure to perform a promised act is not in itself evidence of intent to deceive at the time the promise is made. If it were, the mere breach of a contract would be tantamount to fraud." *Russellville Prod. Credit Ass'n v. Frost*, 484 So.2d 1084, 1086 (Ala.1986). Picker, however, presented no evidence at trial indicating that Daniel Parten intended to breach the promise made in the November 10 letter at the time he wrote the letter. A directed verdict in favor of the Partens on the fraud claim was therefore appropriate.

### D. *John Parten's Directed Verdict*

John Parten was sued as the co-general partner of PPX which benefitted by the alleged breaches of contract and as a co-equal participant with Daniel Parten in fraud. The district court granted directed verdicts in favor of John Parten because, in the court's words, "[h]e could be liable only to the plaintiff if his son, Daniel Parten, was liable for breaching his agreement. And since I have held as a matter of law that that agreement is void under Alabama law, then John Parten could not be liable." (R2:6).

■ John Parten claims that Picker in its brief on appeal never raised any issue in regard to him. He asserts that Picker has thereby abandoned appeal of any of the verdicts directed in his favor. *See Federal Sav. & Loan Ins. Corp. v. Haralson*, 813 F.2d 370, 373 n. 3 (11th Cir.1987) (issues not designated in appellant's brief are deemed abandoned). Picker does, however vaguely, include John Parten in its summary of the argument in its initial brief and discusses the claims against John Parten more at length in its reply brief. *See id.* ("Briefs are read liberally to ascertain the issues raised on appeal."). It is therefore clear that Picker did not intend to abandon the claims against John Parten and that to the extent John Parten may be held liable on Picker's claims this Court's disposition of the directed verdicts on those claims should apply to John as well as Daniel Parten. *See id.* at 374 n. 3 (application of the waiver rule inappropriate where appellee "cannot claim that it was not aware of the issues in th[e] appeal or that

it was hampered in its ability to respond"). Therefore, if it can be shown that liability attaches to John Parten as a partner in PPX for Daniel Parten's breach of the covenant not to compete, then the case may proceed against John as well as Daniel Parten on this claim.[5]

### E. *Damages*

 As a final argument, John Parten points out that Picker failed to offer any proof of lost profits resulting from the Partens' action whereas the Partens offered evidence suggesting that Picker actually lost money on its 1987–88 angiocon service contract with UAB. UAB paid $59,160 for Picker's services, but Picker spent approximately $58,000 on labor and another $20,000 on parts in performing the contract.[6] In an action for breach of a covenant not to compete, however, the plaintiff need not prove actual damages. "If [the plaintiff is] able to establish that breaches ... occurred, then it [is] entitled to nominal damages even if there was a failure of proof regarding actual damages." *Kemper*, 434 So.2d at 1385. John Parten, however, claims that if the damages claimed are merely nominal this Court should affirm the district court on the basis of the doctrine of *de minimis non curat lex*, *i.e.*, the law cares not for trifles. *See City of Talladega v. Ellison*, 79 So.2d 551, 553 (Ala.1955) (stating that a court may decline to interfere in cases in which only nominal damages are involved based on the *de minimis non curat lex* doctrine). Parten, however, ignores the Alabama Supreme Court's statement in *Kemper* that "[w]hen the evidence establishes a breach [of a covenant not to compete], even if only technical, there is nothing discretionary about the award of nominal damages." *Kemper*, 434 So.2d at 1385. The *de minimis* doctrine therefore has no application to the case at bar which would allow our summary affirmance of the district court.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of directed verdict in favor of the defendants on the covenant not to compete issue, but AFFIRM as to all other issues. Daniel Parten's request for attorney's fees is DENIED. We REMAND for proceedings not inconsistent with this opinion.

---

**5.** John Parten did not raise in this appeal the issue of whether he as a general partner in PPX can be held liable for breach of an agreement Daniel Parten entered into individually prior to the formation of the partnership.

**6.** These figures may be deceptive. A Picker employee testified that the $58,000 figure for labor was a "list," *i.e.*, not the actual cost to Picker but a figure generally quoted to customers with a profit already built into it. (R:3:237). Moreover, it is not clear whether the parts figure was "cost" or "list." Therefore, one cannot necessarily conclude that Picker lost money on the 1987–88 UAB contract.