664 So.2d 885 (1995)
BRUNSON CONSTRUCTION AND ENVIRONMENTAL SERVICES, INC.
v.
The CITY OF PRICHARD, et al.
1931102.
Supreme Court of Alabama.
June 30, 1995.
*886 Carl Robert Gottlieb, Jr. and Kenneth A. Watson of Reams, Philips, Brooks, Schell, Gaston & Hudson, P.C., Mobile, for appellant.
Gregory L. Harris of Figures, Jackson & Harris, Mobile, for appellees.
COOK, Justice.
Brunson Construction and Environmental Services, Inc. ("Brunson"), the owner and operator of a solid waste disposal facility, appeals from a judgment (1) declaring void an operating permit issued by the Alabama Department of Environmental Management ("ADEM"), and (2) establishing by injunction a limit on the average daily volume of waste that Brunson might store. We modify the injunction and affirm the judgment as modified.
In April 1986, ADEM issued Brunson a five-year permit to begin operating a solid waste disposal facility now known as the "Jarrett Road" landfill, located in the City of Prichard, Alabama. This permit allowed Brunson to dispose of indeterminate volumes of "construction debris" and "alum mud from American Cyanamid."
Effective October 2, 1990, were amendments to Division Thirteen of the Alabama Administrative Code requiring the establishment of limits to the "average daily volume" of such materials disposable at Brunson's and similarly classified landfills. In regard to these amendments, Jack Honeycutt, who headed the "solid waste branch" of ADEM's "land division," addressed a letter, dated September 24, 1990, to Brunson and other facilities affected by the amendments, stating in pertinent part:
"On August 22, 1990, the Alabama Department of Environmental Management... adopted new and revised regulations for the management of solid waste. These regulations will go into effect on October 2, 1990, and will bring expanded requirements for the operation of solid waste disposal facilities.
"Rule 335-13-5-.05 requires all disposal facilities, both `sanitary landfills' and `landfills' to submit in writing within 45 days the average daily volume of waste received and the geographical area normally or traditionally served by the facility. Those facilities who have previously furnished this information to the Department will not be required to resubmit the information. In addition, all facilities must report their volumes in the format specified. Attached is a sample reporting form. While this form has not changed since February 1989, the method used to calculate the average daily volume is now specified in this Rule."
(Emphasis added.)
The forms provided by ADEM required landfills to calculate average daily volume on a quarterly basis. On these forms, landfills calculated the required average daily volume by adding the volume of waste received each day during a three-month period and dividing the sum by the number of working days in that quarter. Average daily volume was, therefore, a figure representing a quarterly average volume of waste received.
The record in this case contains quarterly reports submitted by Brunson for the quarter ending September 1990, and for each quarter thereafter, including the quarter ending March 1993. The average daily volumes *887 reported on these forms were 0, 0, 250, 255.13, 107, 580, 225, 314, 265.48, 249, and 291 cubic yards, respectively.
Nevertheless, on February 11, 1991, ADEM sent Brunson a letter stating:
"As of the date of this letter, the Department has not received the required Average Daily Volume, Service Area, or the Quarterly Volume Report (December 1990 Quarter) for the above referenced facility.
"Within 15 days from your receipt of this letter, the Department requests that the aforementioned reports be submitted. Failure to respond within the time specified could result in the Department taking further enforcement action."[1]
(Footnote added.)
On March 11, 1991, Brunson sought to renew its five-year permit, which was to expire on April 9, 1991. ADEM acknowledged receipt of the renewal request in a letter to Brunson dated April 17, 1991, stating: "During this review process, Brunson ... may continue to operate the landfill under the existing permit provided all permit conditions are maintained."
This "review process" was still impending the next year, that is, on May 18, 1992, when ADEM responded to correspondence from Brunson, in which Brunson apparently requested permission to receive, coincident with the installation of certain "lined cells," quantities of "petroleum-contaminated" waste. More specifically, ADEM stated:
"Your request to temporarily stockpile contaminated soils from the old Greyhound Bus Station in Mobile has been reviewed. This request is approved with the following conditions:
". . . .
"If the lined cell at this facility should not be permitted, this material must be removed and disposed at a permitted facility approved by this Department."
(Emphasis added.) In addition to requesting permission to process contaminated soil, Brunson, during the pendency of its permit renewal, also sought permission to process an average daily volume of 4245.3 cubic yards of waste.[2]
The "review process" was still impending on November 10, 1992, when ADEM issued the following "Public Notice":
"The Alabama Department of Environmental Management (ADEM) pursuant to Code of Alabama 1975, Section 22-27-1 et seq., as amended, and regulations promulgated thereunder, [hereby] gives notice that Brunson Construction Company, Inc. has applied for a renewal and modification of the operational permit for the Jarrett Road Landfill. The facility is currently permitted to accept for disposal non-hazardous demolition debris, stumps, limbs, tires, leaves, grass clippings, and similar type material generated in Mobile County, Alabama. In addition, the permittee is requesting that the permit be modified to include the construction of two lined cells for the disposal of petroleum contaminated soils from underground storage tank removal and remediation sites and other similar materials located within Mobile County. The average daily volume of non-hazardous debris will be [240.3 cubic yards] per day and the average daily volume of petroleum contaminated soil and other materials to be disposed of in the lined cells will be [4005 cubic yards] per day.
". . . .
"Any interested person may, within thirty-five (35) days following publication date of this notice, request a public hearing. A request for a public hearing must indicate the reasons why a hearing is requested. If the Department determines that a petition constitutes cause or that there is significant public interest in an application for a permit, the Director of the Department may schedule a hearing.
". . . .
"After consideration of all written comments, review of any public hearing record, and consideration of the requirements and *888 policies of the Solid Wastes Disposal Act, [and] the applicable regulations, the Department will make a final determination regarding permit issuance."
(Emphasis added.)[3]
The City of Prichard responded to this notice in a letter to ADEM dated December 14, 1992, stating in pertinent part:
"This letter ... request[s] that a public hearing be held in connection with the above referenced application. The landfill which is the subject of the application is located within the City of Prichard, Alabama, where the environmental and socio-economic impacts posed by the renewal/modification of this application will have its greatest effect....
". . . .
"... The modification of the permit for this landfill raises several concerns:
"1) The City of Prichard has been informed that the Jarrett road Landfill may have been accepting petroleum contaminated materials during the pendency of its application for renewal/modification. The City of Prichard is concerned that damage may be occurring to the ground and water table in this area. Moreover, what volatile vapors are escaping into the atmosphere from the petrochemical contaminants and what precautions will the residents of the City of Prichard be required to take in order to protect their lives and property?
". . . .
"3) South Mobile County is one of the wettest areas in the United States. According to the National Weather Service in Mobile, the Mobile-Prichard metro area is among the top 2 cities in America in annual rainfall. What impact will all of this rain have on the contaminants at this site: Are any of the contaminants expected to leach out into the ground and water table?
". . . .
"The Jarrett Road Landfill, as it is currently permitted by ADEM, poses a considerable hazard to the residents in the immediate area. If the landfill is granted a modification of its permit, the increased traffic, the presence of obnoxious odors and hazardous material would severely affect these residents' property values and quality of life. It is estimated that volume intake at the Jarrett Landfill would increase from 90 tons per day to approximately 1500 tons per day. That would be a substantial change in the volume of materials and would without a doubt have a significant impact [on] our citizens in the area of the landfill.

"The Mayor and City Council of the City of Prichard believe that the potential adverse environmental and socio-economic impact of a renewal/modification of Brunson's permit demands that a public hearing be held so that the questions surrounding this project can be fully explored before it is too late."
(Emphasis added.)
Within three weeks of this letter, ADEM issued a second "Public Notice," which essentially tracked the language of the November 10 notice, except for the following discussion of the proposed permitted volume:
"Based on quarterly volume records on file, the Department has determined [that] the historic average daily volume of this landfill has been [696] cubic yards or [261] tons per day. The permittee is not requesting an increase of this volume."
(Emphasis added.)
On April 20, 1993, the City of Prichard and owners of real estate lying in proximity with the landfill (collectively designated "City of Prichard"), sued Brunson, seeking a judgment declaring that applicable statutes and ADEM regulations required Brunson to obtain approval of the City of Prichard's governing body before it could (1) process "petroleum contaminated waste, or any other such wastes" unsuitable for disposal in "unlined, *889 inert landfill[s] lacking leachate collection or gas monitoring facilities"; (2) modify the landfill by the construction of the proposed "lined cells"; or (3) process an average daily volume of waste in excess of 120% of 164 cubic yards. The complaint also sought enforcement of the judgment through injunctive relief. An amended complaint filed on May 11, 1993, added ADEM as a defendant, and sought to enjoin it from issuing Brunson a permit to implement these operations. On July 9, 1993, ADEM issued Brunson a permit authorizing it to install lined cells and to process an average daily volume of 696 cubic yards of waste, as proposed in the January 1, 1993, preliminary permit.
The case proceeded to trial on August 18, 1993, following which the trial court declared void "[t]he aspect of the permit issued by ADEM on July 9, 1993, authorizing for disposal an average daily volume of 696 cubic yards." Additionally, the trial court permanently enjoined Brunson "from accepting for disposal an average daily volume in excess of [160] cubic yards without first obtaining approval by the City of Prichard."[4] It also permanently enjoined ADEM "from issuing a permit or otherwise allowing Brunson to accept for disposal an average daily volume in excess of [160] cubic yards ..., without first having proof of approval by the City of Prichard." From that judgment, Brunson appealed.[5]
This appeal requires us to consider how ADEM mayconsistent with Ala.Admin.Code § 335-13-5-.05calculate the volume of solid waste it establishes as a firsttime benchmark figure, see supra note 3, in the operating permits issued to waste facilities (hereinafter designated "permitted volume"). Resolution of this issue requires discussion and comparison of three methods involved in this case: (1) one proposed by the City of Prichard, (2) one used by ADEM and vacated by the trial court, and (3) one used by the trial court itself.

I. City of Prichard's Method
The City of Prichard contends that § 335-13-5-.05 expressly sets forth the method by which permitted volume must be calculated. The City of Prichard bases this contention on its construction of the following relevant provisions:
"Permits may be modified at any time to include provisions of regulations or statute not in the existing permit....
"(1) Permit modification shall be required utilizing forms designated by the Department when the permittee proposes to modify its operation in any of the following ways:
"(a) There is any change in the traditional or permitted service area....
"(b) The average daily volume of waste specified by the permit for a disposal facility is proposed to be exceeded, or is exceeded for two or more consecutive reporting quarters, by 20 percent, or 100 tons/day, whichever is less.
"1. The average daily volume of waste received at a disposal facility [`reported volume'] shall be calculated by dividing the total month's receipts by the total number of days in the reporting month."
(Emphasis added.)
The City of Prichard, construing the Honeycutt letter and § 335-13-5-.05(1)(b)1., contends that Brunson was required to request, within 45 days of the effective date of the amended rules, permission to store an average daily volume of waste, represented by a definite figure. This figure, it insists, was to be calculated according to the formula provided by § 335-13-5-.05(1)(b)1., namely, "by dividing the total month's receipts by the total number of days in the reporting month." This figure was, it contends, to *890 "become the permitted average daily volume of the landfill." Brief of the Appellees, at 9. Under this analysis, because Brunson reported to ADEM that it had processed "0" average daily volumes of waste during the quarters ending September and December 1990, ADEM should have established "0" as Brunson's permitted volume.
To be sure, subsections (b) and (b)1. each refer to a figure representing average daily volume. However, each subsection describes the figure differently, namely, "[t]he average daily volume of waste specified by the permit "that is, the permitted volumeand "[t]he average daily volume of waste received," respectively. (Emphasis added.) In support of its contention that § 335-13-5-.05 prescribes the method for computing permitted volume, the City of Prichard places an identical meaning upon both figures. In other words, it regards the method by which ADEM was to calculate a facility's permitted volume as identical to the formula used to calculate the facility's received volumeat least as to the quarter ending after the facility's first obligation to report.
The validity of the City of Prichard's construction of § 335-13-5-.05 turns on whether that construction is consistent with ADEM's interpretation. This is so, because the interpretation of an agency regulation by the promulgating agency carries "`controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); see also Parker v. Bowen, 788 F.2d 1512, 1518 (11th Cir.1986); Strength v. Alabama Dep't of Finance, 622 So.2d 1283, 1287-88 (Ala.1993). That ADEM does not construe § 335-13-5-.05 in the manner advocated by the City of Prichard was evident at trial.
For example, considerable testimony was directed to four important sentences contained in the Honeycutt letter of September 24, 1990, which sentences are as follows:
"[1] Rule 335-13-5-.05 requires all disposal facilities, both `sanitary landfills' and `landfills' to submit in writing within 45 days the average daily volume of waste received and the geographical area normally or traditionally served by the facility. [2] Those facilities who have previously furnished this information to the Department will not be required to resubmit the information. [3] In addition, all facilities must report their volumes in the format specified. [4] Attached is a sample reporting form."
Sue Robertson, who served as ADEM's "chief of land division," conceded that these instructions were "poorly worded" and that the confusion generated thereby had prompted a number of waste facility operators to contact ADEM for clarification. She testified, however, that ADEM was, in these four sentences, actually soliciting two calculations. Sentences one and two, she stated, referred to "the permitted baseline historical data" to be submitted once"within 45 days" of the effective date of the amended rulesfor use in determining a waste facility's permitted volume, that is, pursuant to § 335-13-5-.05(b). She explained that when waste facility operators contacted ADEM for clarification of "[w]hat they were to submit `within 45 days,'" they were told "to look at what they were doing [and] to look at what they were expecting to do in the forthcoming years [and] months in their particular area, and to give them[selves] some [room for] growth some comfort." Additionally, she testified that ADEM did not "mean or expect that facilities would make [the] submission [sought in sentences one and two] using the calculation method specified in [§ 335-13-5-.05(b)1.]"[6] These aspects of Robertson's testimony were fully corroborated by the testimony of Russell Kelly, who, at the time of trial, was occupying the position formerly held by Honeycutt.
Moreover, the record contains no evidence that ADEM, in practice, used the method advocated by the City of Prichard to establish permitted volumes. Indeed, the City of *891 Prichard concedes that the "volume for most facilities was actually established by a different method instituted by Jack Honeycutt.... Using the `Honeycutt Rule' each landfill operator would simply tell ADEM what volume it wanted and, if ... Honeycutt believed it to be reasonable, ADEM would set that volume as the landfill's permitted daily volume." Brief of Appellee, at 32.
We conclude, therefore, that ADEM, unlike the City of Prichard, does not equate the method used to calculate a facility's permitted volume with the formula used to calculate its quarterly reported volumes.[7] Because ADEM's construction is controlling, § 335-13-5-.05 must not be understood as containing a formula or method for calculating permitted volume. Brunson's permit was not invalid, therefore, on the ground that the permitted volume had not been calculated according to the formula set forth in § 335-13-5-.05(b)1. It does not follow, however, that the method by which ADEM did establish the permitted volume, and, consequently, the volume that was established thereby, was valid.

II. "Kelly" Method
In establishing Brunson's permitted volume of 696 cubic yards, Russell Kelly chose the single, highest average daily volume of waste Brunson had reported as of December 1992, when ADEM issued its second preliminary permit, namely, 580 cubic yards. This figure, which appeared on the report for the quarter ending December 1991, Kelly multiplied by 1.2, in order, testimony established, to provide a "20% cushion" for "growth" (the "Kelly method"). This method of establishing permitted volume the trial court declared invalid, holding that it was "arbitrary" and "capricious."
Brunson concedes that the "court certainly could have enjoined" the use of the Kelly method "to establish permitted volumes," Appellant's Reply Brief, at 11, had it "correctly determined that the method ... was arbitrary and capricious." Id. (emphasis added). Cf. State Health Planning Agency v. Mobile Infirmary Ass'n, 533 So.2d 255, 257 (Ala.Civ.App.1988); ("judicial review [of administrative action] is limited to questions of whether the agency exceeded its statutory authority, whether its decision was supported by substantial evidence, and whether its action was arbitrary"); State Dep't of Pensions & Security v. Whitney, 359 So.2d 810, 812 (Ala.Civ.App.1978). Brunson contends, however, that the Kelly method constituted a reasonable, nonarbitrary basis on which to establish Brunson's permitted volume, because, it insists, that method "was based on actual data evidencing the operations of the landfill." For the following reasons, however, we are unpersuaded by Brunson's reasoning.
First, ADEM, in its second preliminary permit, declared that it had derived the proposed permitted volume by calculating Brunson's "historic average daily volume." (Emphasis added.) The term "average," of course, suggests that ADEM had added a number of average daily volume figures, and had then divided the sum by the number of quarters used in calculating that sum. The permitted volume actually derived, however, from a figure representing a historic "maximum," that is, the single, highest, average daily volume ever reported by Brunson. Thus, the permitted volumebased, as it was, on this historic maximum average daily volumebore no rational relationship to ADEM's declared formula. Moreover, from all that appears of record, in no other instance had ADEM used the Kelly method to establish a waste facility's permitted volume. The fact that the Kelly method involved verifiable data does not, therefore, validate the method, where the method was used only once, and, in that instance, was based entirely on a single item of information, namely, one atypical average daily volume. Otherwise stated, the permitted volume of 696 cubic yards based on the Kelly method, the origin and application of which were established by undisputed evidence, was too high as a matter of law.
*892 This aspect of the dispute is, therefore, subject to the well established exception to the "exhaustion-of-remedies" doctrine, that is to say: "Although administrative remedies must generally be exhausted before resort can be had to the courts, such exhaustion will not be required where the issue to be decided is solely a matter of law, not dependent upon disputed facts." Simpson v. Van Ryzin, 289 Ala. 22, 265 So.2d 569, 577 (1972) (emphasis added); Dawson v. Cole, 485 So.2d 1164 (Ala.Civ.App.1986). Consequently, the trial court, having correctly concluded that the Kelly method was arbitrary and capricious, committed no error in vacating the "aspect of [Brunson's] permit" calculated thereby.[8]
This conclusion does not, however, diminish the fact that the establishment of permitted volume is, by statute, a specific example of administrative action. See Ala. Code 1975, § 22-22A-3, which defines "administrative action" as including "[t]he issuance, modification, repeal or denial of any permit." Thus, although the trial court was competent to determine whether the method used in this case to establish Brunson's permitted volume accorded with applicable rules, statutes, and regulations, it was not empowered by any of those authorities to calculate the permitted volume in the first instance.

III. Trial Court's Method
The peculiar difficulties encountered by the trial court in attempting to establish a permitted volume are demonstrated by the following colloquy, which transpired between Brunson's counsel and the trial judge during a post-judgment hearing:
"BRUNSON'S COUNSEL: The court went on and established a permitted average daily volume of 160 yards in this case.
". . . .
"THE COURT: That's notthat was not established from any evidence. My view was that Brunson didn't prove the right to deposit much of anything and that Brunson had the burden. It is just as an equitable matterI didn't feel like shutting them down lock, stock and barrel and I found somehow or other that the other side would acquiesce in that. In other words, it is not that it was proved that 160 cubic yards, whatever it was, was appropriate, it is not proved by anything. It is simply that I didn't want to shut them down and the other side didn't kick when I let them do that much and, therefore, it ended up as part of the relief. I agree with you that there is the lack of proof on what is appropriate and it is a real problem.
"BRUNSON'S COUNSEL: And that's where I was going, Judge. It is uncertainI understand you gave us that as a matter of equitable grace and it is just hard to tell where it came from. What I am getting from your Honor this morning we are probably not going to be able to tell....
"THE COURT: Yes, basically, what I figured I could get away with as far as the plaintiffs were concerned with."
(Emphasis added.)
Notwithstanding these remarks, the City of Prichard contends that "[t]he record is replete with evidence sustaining the ... decision of the trial court." Brief of Appellee, at 44. In support of this contention, however, it cites only Brunson's reports for the quarters ending September and December 1990, neither of which contained any evidence of waste deposits. Therefore, at the time October 1990at which Brunson should have requested from ADEM a specific permitted volume, Brunson's records, the City of Prichard contends, failed to establish that Brunson was entitled to any permitted volume. In other words, the City of Prichard attempts to bolster the trial court's calculations, which produced a figure of 160 cubic yards, with evidence that Brunson was entitled to 0 cubic yards.
*893 This argument is unpersuasive. The City of Prichard has thus failed to offer a formula, which, when applied to data contained in the record, would support the trial court's calculations. Similarly, our own attempts to correlate the trial court's calculations with relevant data have been unfruitful.
The judiciary's difficulty in developing a coherent method of its own for establishing a permitted volume demonstrates the utility and wisdom of deferring such matters to the agency charged with that duty. In cases involving the issuance of licenses or permits, courts lack the "`specialized competence'" possessed by licensing agencies functioning in the "`field of operation entrusted to [them] by the legislature.'" Hamrick v. Alabama Alcoholic Beverage Control Bd., 628 So.2d 632, 633 (Ala.Civ.App.1993). ADEM should not, therefore, have been relieved of its responsibility to establish Brunson's permitted volume. See Fraternal Order of Police, Strawberry Lodge No. 40 v. Entrekin, 294 Ala. 201, 210, 314 So.2d 663, 671 (1975).

IV. ADEM's Responsibility
As the preceding discussion demonstrates, the obstacle to a resolution of this dispute is the absence in the rules or statutes of reviewable criteria governing the establishment of permitted volumes, when those criteria become necessary upon requests for volume modifications or for initial permits. In this connection, the trial court not only correctly held that the procedure used to calculate permitted volume in this case was arbitrary and capricious, but also correctly concluded that the permitted volume "was established in violation of the Alabama Administrative Procedure Act," Ala.Code 1975, §§ 41-22-1 to -27.
The provisions of the Administrative Procedure Act impose upon administrative agencies the dutypreliminary to the "adoption, amendment, or repeal," § 41-22-5(a)(1), of "rules of practice," § 41-22-4(a)(2)to publish the "terms or substance" of such rules, § 41-22-5(a)(1), and, among other things, to "[a]fford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing." Section 41-22-5(a)(2). Noncompliance with these provisions voids every "agency rule, order, or decision" taken in any case in which the provisions are applicable. Section 41-22-4(b). Section 41-22-3(9) defines a "rule" as "[e]ach agency regulation, standard or statement of general applicability that implements, interprets, or prescribes law or policy, or that describes the organization, procedure, or practice requirements of any agency." (Emphasis added.) This definition expressly excludes, however, "[a]n order which is directed to a specifically named person or to a group of specifically named persons which does not constitute a general class." Section 41-22-3(9)e.
Brunson contends that the process of calculating permitted volume is exempted from the procedural requirements to which agency rulemaking is generally subject, because, it insists, such agency action exemplifies the action described in § 41-22-3(9)e. In other words, it argues, ADEM's method of calculating permitted volume for individual landfills does not involve a "standard or statement of general applicability." Section 41-22-3(9) (emphasis added). We disagree with Brunson's interpretation of § 41-22-3(9)e.
During the Honeycutt administration, at least, ADEM had a method for determining waste facilities' permitted volumes. That methodalbeit unwritten, informal, and confined "pretty much within the mind of Jack Honeycutt"[9]was used each time a landfill's permitted volume was established. Thus, the method used by ADEM has had, and will continue to have, "general applicability." Indeed, our reason for rejecting the Kelly method, namely, that it was purely arbitrary, suggests that any method used by ADEM must, for rationality purposes, have "general applicability" to all waste facilities within the state. The fact that such a method may yield different results when applied in the circumstances unique to each facility does not bring it within the exception set forth in § 41-22-3(9)e.
*894 Because the "[a]doption of rules describing the internal organization of an agency and the actual procedures and policies of a state agency will enable the public to hold agencies to the standards to which it is intended they be held," § 41-22-4, comments, we conclude that ADEM mustpursuant to §§ 41-22-4 through -7formally promulgate a rule or regulation articulating the factors or criteria that are to be considered in establishing permitted volumes for Alabama waste facilities in connection with volume modifications or initial permits. We do not presume to suggest a roster of specific factors to be included, nor do we preclude the use of factorsto the extent they are ascertainablethat were used by Jack Honeycutt. We note, however, that the legislature has provided some guidance in its statement of "legislative intent" prefatory to Act No. 89-824, 1989 Ala.Acts 1638, codified at Ala.Code 1975, §§ 22-27-40 to -49. In enacting legislation encouraging the development of "solid waste management plans," the legislature intended, among other things:
"(4) To facilitate the siting of solid waste management facilities as required to meet present and projected state and local needs;

". . . .
"(7) To assure public involvement in the development and implementation of plans for the management of solid wastes;
". . . .
"(9) To assure that solid waste management facilities and services are provided to state residents in a manner which assures their availability at reasonable costs; and
"(10) To assure that the creation, licensing, and operation of landfill solid waste disposal facilities should be limited to what is reasonably required to service the needs of the inhabitants and businesses of this state, having regard for alternative technologies for waste reduction, management and disposal."
Ala.Code 1975, § 22-27-42 (emphasis added).
In summary, we have concluded (1) that the permitted volume established by the trial court was not supported by any evidence; (2) that ADEM, not the trial court, bears the responsibility of establishing Brunson's permitted volume; but (3) that ADEM, having failed to comply with the rule-promulgation provisions of the Alabama Administrative Procedure Act, has, at this time, no valid basis upon which to recalculate Brunson's permitted volume. We have also weighed these competing considerations in light of the amendments to Division Thirteen of the Alabama Administrative Code requiring that Brunson operate under an established permitted volume. Having balanced the equities between the two parties, we, therefore, modify the injunction by providing that it shall be dissolved as soon as ADEM promulgates a rule consistent with our discussion, and, pursuant to that rule, recalculates and reestablishes a permitted volume for Brunson.
Review of the recalculated permitted volume shall then proceed in compliance with the procedures established by Ala.Code 1975, §§ 22-22A-6 and -7, for reviewing the "administrative actions" of ADEM. In other words, if the City of Prichard is dissatisfied with the recalculated permitted volume, it shall be entitled to challenge the agency's action in the context of the statutory provisions applicable to the review of actions of administrative agencies.
Moreover, the recalculation ordered in this opinion will establish Brunson's permitted volume for the first time. See supra note 2. We, here, thus state that which is elsewhere implied, that a legally sufficient determination in establishing Brunson's permitted volume will not constitute a "permit modification," § 335-13-5-.05(1) (emphasis added), and, consequently, will not require "approval by the affected unit of local government," as would otherwise be required by Ala.Code 1975, § 22-27-48(a). See supra note 4.
AFFIRMED AS MODIFIED.
ALMON, SHORES, HOUSTON, and INGRAM, JJ., concur.
BUTTS, J., concurs specially.
BUTTS, Justice (concurring specially).
I concur with the majority opinion. However, I write to further address the requirement *895 that the Alabama Department of Environmental Management (hereinafter "ADEM") undertake formal "notice and comment" rulemaking, as required by the Alabama Administrative Procedure Act (hereinafter "AAPA"), Ala.Code 1975, § 41-22-1 et seq.,[10] in order to establish the method by which a landfill's daily "permitted volume" will be calculated by that agency.
I recognize that the expertise of administrative agencies in their special areas of delegated authority calls for deference in judicial review of agency decision-making. However, the discretion granted to this state's administrative agencies is not boundless. As noted by the majority, when adopting procedures or setting policies that have general applicability to a regulated industry or other "community" of parties, such as the method or manner by which ADEM sets the daily permitted volume of a landfill, the administrative agency is bound to create that "rule" through formal AAPA rulemaking procedures. Although requiring such a process may confine the discretion of administrative agencies, that loss of discretion is offset by the increased fairness to the regulated parties and the general public that notice and comment rulemaking provides.[11]
An administrative agency "rule" includes any "agency regulation, standard or statement of general applicability that implements, interprets, or prescribes law or policy or that describes the organization, procedure or practice requirements of any agency." Ala.Code 1975, § 41-22-3(9) (emphasis added). This Court has previously stated that in interpreting the procedural requirements of the AAPA, "the word `rule' is intended to have a broad definition." Ex parte Traylor Nursing Home, Inc., 543 So.2d 1179, 1183 (Ala.1988). In Ex parte Traylor Nursing Home, this Court ruled that an amendment to the State Health Plan ("SHP") that allowed hospitals to use up to 10 "swing beds"beds used either for normal hospital patients or skilled-care nursing home patientswas a standard of "general applicability" to all hospitals and, thus, was an administrative "rule." 543 So.2d at 1184. Accordingly, this Court held that the SHP amendment was void because it had not been adopted through AAPA rulemaking procedure. As noted by the majority, ADEM's "method" for establishing the daily permitted volume has been, and will continue to be, generally applicable to all landfillsthus, this "method" is a definite example of an administrative rule.
In this case, the "method" used by ADEM to establish a landfill's daily permitted volume clearly reflects one of the reasons for placing certain limits on the discretion granted to administrative agencies. Here, the authority delegated to a state agency ultimately came to rest in a single state employee first, Jack Honeycutt, who set a landfill's daily permitted volume at whatever amount the landfill requested if he personally considered it to be reasonable, and later, Russell Kelly, who devised his own method of choosing the highest "average daily volume" and multiplying that figure by 120%. As the majority notes, the trial court correctly held that the Kelly method was arbitrary and capricious.
In review of a similarly arbitrary "method" used by an employee of the Iowa Department of Natural Resources to set daily limits for the discharge of ammonia by a wastewater treatment facility into a river, the administrative law judge ruled that the "one-day *896 maximum standard personally promulgated by [the employee] is clearly and squarely within the statutory definition of a rule." City of Ames v. Iowa Department of Natural Resources, 1991 WL 639354 (Iowa Dep't. Insp. & App.) at 8 (emphasis added).[12] The administrative law judge further commented:
"The one-day maximum [standard] prescribed policy and law. As such, it was a rule. Quite simply, and in all due respect to the Department, the best-professional-judgment approach used by [the employee] in deciding on the standard violated each and every requirement for public rulemaking... set forth in Iowa Code section 17A.4. A policy statement intended in any manner as a basis for overt or covert decisionmaking by an agency must be adopted pursuant to rulemaking procedures [in order] to be enforceable against the public or other governmental bodies."
Id. at 8-9 (emphasis added).
Rather than relying on the thought processes of one employee, although that employee may be well experienced, there are a multitude of relevant factors that could be established by ADEM through rulemaking procedures and then thoroughly considered each time a landfill's daily permitted volume is set. When a state agency adopts such "methods" of internal procedure that have general applicability to a regulated industry and potentially affect the health and safety of the citizens of Alabama, concepts of fairness, due process, and common sense dictate that a well-ordered process, with the benefit of input from all interested parties, be followed.
As Justice Adams noted in Ex parte Traylor Nursing Home, "[t]he purpose of the AAPA, at least in part, is to protect public interest and participation, as well as to increase governmental accountability by establishing specific notification procedures that must be followed in order for a state agency to implement rules and regulations that affect the public." 543 So.2d at 1180. I find that statement particularly compelling in this case, where, during the trial court's hearing, Russell Kelly explained the reasoning behind ADEM's prior methods for determining a landfill's daily permitted volume:
"With the new regulation at that time being proposed [requiring the establishment of a daily permitted volume for landfills], certainly a hindrance to business. It was not what the Department wanted to do. So, in an effort to implement this rule and to be business friendly or landfill friendly, they were allowed a substantial cushion, basically whatever they wanted within reason."
Given that statement by a key ADEM employee, perhaps the agency should be reminded that it was created to implement the state's "environmental regulatory system" and to "protect human health and safety." Ala.Code 1975, § 22-22A-2. ADEM was created to establish and enforce environmental regulations. Of course, that enforcement must be balanced with reasonable efforts to assist industry in maintaining regulatory compliance. However, in this case, it appears that ADEM tipped the scales against the public by implementing an environmental regulation so as to be "business friendly or landfill friendly." Unfortunately, such a policy would reduce ADEM's oversight process to the rubber stamp approval of industry requests regarding landfill volumes. It is even more sobering as an indication that ADEM may have adopted an internal philosophy that compromises its role as the primary regulatory body protecting the environment and, thus, may ultimately violate the public trust.
NOTES
[1] See infra note 7.
[2] The waste volumes involved in this case have been indiscriminately described by the parties in terms of "tons" and "cubic yards." We, however, have converted all tonnage figures to cubic yards, at the rate of 2.67 cubic yards per tona formula that was demonstrated at trial.
[3] This "preliminary permit" proposing to allow Brunson to store an average daily volume of 4245.3 cubic yards thus contained the first express reference to a definite storage limit established by ADEM.
[4] The trial court's "local approval" requirement had specific reference to Ala.Code 1975, § 22-27-48(a), which prohibits ADEM from "consider[ing] an application for a new or modified permit for a facility unless such application has received approval by the affected unit of local government having an approved plan [`for the management of solid waste generated within its boundaries,' § 22-27-47]." The City of Prichard was a participant in such a plan adopted November 13, 1990.
[5] In prosecuting this appeal, the parties have not presented all the issues that were of concern in the trial of the cause. We address only those issues directly presented in this Court.
[6] Her testimony also demonstrated that sentences three and four referred to the data that were to be calculated by the formula set forth in § 335-13-5-.05(b)1. and submitted in the quarterly reports to ADEM.
[7] Indeed, had ADEM construed § 335-13-5-.05(b) and (b)1. as does the City of Prichard, it would not have warned Brunson in its letter of February 11, 1991, that Brunson was delinquent in submitting an "Average Daily Volume." The record reveals that Brunson was not delinquent in submitting the quarterly reports required under ADEM's construction of subsection (b).
[8] The facts of this case also implicate the "irreparable harm" exception to the exhaustion-of-remedies doctrine. Generally, that exception applies "when requiring exhaustion of administrative remedies would result in irreparable harm." Goolsby v. Green, 431 So.2d 955, 958 (Ala.1983). Although we do not base our holding on that ground, we note that the exception is implicated by Brunson's storage of petroleum-contaminated wastea matter prominently addressed in the City of Prichard's letter to ADEM and presented as a ground for relief in its complaint.
[9] Brief of Appellee, at 33.
[10] The AAPA requirements for a state administrative agency's adoption of a "rule" are set forth in Ala.Code 1975, §§ 41-22-4 to -7. Most importantly, § 41-22-5 requires 35 days' notice to the public by publication in the Alabama Administrative Monthly and an opportunity for the public to comment, either orally or in writing.
[11] ADEM has previously been ordered to implement generally applicable policy through formal rulemaking procedure. In the matter of Techtrix, Inc. v. Alabama Department of Environmental Management, Docket No. 92-15, September 23, 1992, the Environmental Management Commission, which oversees the actions of ADEM, revoked ADEM's administrative order penalizing Techtrix for violation of a state regulation. The Commission ruled that because ADEM had wholly adopted a federal Environmental Protection Agency ("EPA") regulation as a state regulation, but was not giving that regulation the established EPA interpretation and had not initiated formal rulemaking to establish its differing interpretation with the general public, the order penalizing Techtrix for a violation based on the differing interpretation could not be upheld.
[12] The definition of a "rule" in the Iowa Administrative Procedure Act is nearly identical to that in the AAPA. Iowa Code, § 17A.2(7) (1976).