306 So.2d 227

**FIRST NATIONAL BANK OF MOBILE, a**
National Bank and Body Corporate,

v.

George Lewis BAILES, Jr., as
trustee, etc., et al.

**SC 665.**

Supreme Court of Alabama.

Jan. 9, 1975.

T. Massey Bedsole and Louis E. Braswell, Mobile, for appellant.

I. David Cherniak, Mobile, and R. Clifford Fulford, Birmingham, for appellees.

**476**

BLOODWORTH, Justice.

This is a second appeal in this case. For our decision on the first appeal, see Bailes v. First National Bank of Mobile, 291 Ala. 385, 281 So.2d 632 (1973).[1]

On the first trial, the trial court rendered judgment for defendant, First National Bank of Mobile. Plaintiff, George Lewis Bailes, as Trustee in Bankruptcy of American Southern Publishing Company, Inc., a bankrupt, appealed. On July 5, 1973, this Court, in the former opinion authored by Mr. Justice Faulkner, reversed and remanded the cause.

On the second trial, the First National Bank of Mobile offered new evidence on several of the points spoken to by this Court in its first opinion. The case was again submitted to the trial judge on the new evidence and the record of all prior proceedings. The trial judge obviously concluded that the new evidence did not alter the mandate of this Court's former opinion, and, accordingly, rendered judg-

ment for Bailes, the Trustee in Bankruptcy. It is from that judgment that First National Bank of Mobile appeals. We affirm.

Under the provisions of Tit. 13, § 28, Code of Alabama 1940 (Recompiled 1958), we have held that:

"* * * a former opinion does not conclude or influence us, upon a subsequent appeal, and, if we consider our former opinion to be erroneous, it will be overruled. Smith v. Smith, 157 Ala. 79, 47 So. 220, 25 L.R.A.,N.S., 1045. On the other hand, if upon reexamination, we determine that our previous ruling is sound, we may reaffirm our decision on former appeal. City of Birmingham v. Bouldin, 280 Ala. 76, 190 So.2d 271; Bank of Luverne v. Reddoch, 211 Ala. 699, 100 So. 922. * * *" City of Fairhope v. Town of Daphne, 286 Ala. 470, 241 So.2d 887 (1970).

This cause arose out of the following circumstances.

On October 7, 1966, the American Southern Publishing Company, Inc. (hereinafter called "Bankrupt") filed a voluntary petition in bankruptcy. Appellee George Lewis Bailes, Jr., (hereinafter called "Trustee") became its receiver and later its trustee. A substantial part of Bankrupt's assets consisted of a large quantity of school textbooks stored on the premises of the Publishers Warehouse Division of EBSCO Investment Services, Inc. (hereinafter called "EBSCO"). The First National Bank of Mobile (hereinafter called "Bank") claims these books[2] as collateral security for a series of ten notes executed by the Bankrupt in favor of the Bank between August 22, 1966, and September 30, 1966.

■ As of the date of bankruptcy, a trustee in bankruptcy acquires the same

---

1. For the related federal case, see In re American Southern Publishing Company, 5 Cir., 426 F.2d 160 (1970), cert. den., Bailes v. First Nat. Bank, 400 U.S. 903, 91 S.Ct. 141, 27 L.Ed.2d 140 (1970).

2. To preserve the Bankrupt's estate and by agreement of the parties, the books were sold in the Bankrupt's normal course of business and the proceeds deposited at interest in an escrow account.

rights in the bankrupt's property as those held by a judgment lien creditor under state law. Bankruptcy Act, § 70(c), 11 U. S.C. § 110(c). Therefore, the issue presented is whether, or not, the Bank, as of October 7, 1966, had taken those steps necessary to protect its claimed interest in the books or their proceeds from a judgment lien creditor.

The Bank contends that, by the various agreements between it, the Bankrupt, and EBSCO, a valid common-law pledge was created.[3]

The evidence is largely, if not entirely, undisputed. The real dispute concerns the legal conclusions to be drawn therefrom.

The Bankrupt had entered into contracts with the State of Alabama to supply state schools with certain designated textbooks at an established price per book. The quantity of books was not specified, but the contracts required Bankrupt to have sufficient textbooks on hand to fill the State's orders within thirty days. The Bankrupt placed in the EBSCO warehouse a sufficient quantity of books to handle the orders of all its customers including the State. Seventy percent of Bankrupt's business consisted of contracts with the State. In its contract with Bankrupt, EBSCO agreed to carry out, as agent, the Bankrupt's contracts with the State and others. EBSCO had deposited with it the books of other publishers under similar contracts.

In the normal course of business, the State submitted purchase orders to EBSCO who forwarded the orders to Bankrupt. EBSCO would then ship the books. Upon confirmation of delivery, the State would make payment.

In April 1966, Bank and Bankrupt began working on plans to finance Bankrupt's operations. It appears to have been contemplated by the parties that loans made by the Bank would largely be repaid with the proceeds of the Bankrupt's state contracts.

On April 7, 1966, the Bank asked that invoices which the Bankrupt would submit to the State be marked to show that they had been assigned by Bankrupt to the Bank and to show that the Bank had been authorized to receive payment directly from the State.

On June 24, 1966, the Bankrupt informed the Bank that it was assigning to the Bank the proceeds of certain of its contracts with the State. On that same date, the Bankrupt wrote the State authorizing the State to mail all state checks payable to Bankrupt to the Bank to be credited to an escrow account in the name of Bankrupt.

On June 25, 1966, the Bankrupt sent the Bank a certified inventory of its books on deposit with EBSCO as of March 31, 1966. Although the parties often referred to this inventory as a "warehouse receipt," it did not comply with the statutory requirements for such a document.

In a letter dated July 7, 1966, the Bankrupt wrote EBSCO: "This is to advise you that we recently concluded a working agreement with the First National Bank of Mobile, Alabama for a loan and as a form of collateral we made a consignment of our inventory now warehoused in the Publisher's Warehouse. A duplicate shipping document of all shipments made relative to the shipment of our inventory report dated March 31, 1966 will be sent to the First National Bank in Mobile, Alabama to the attention of Mr. H. Austill Pharr. When this loan has been satisfied and a release has been granted jointly between this office and Mr. Pharr of the First National of Mobile, Alabama, you will be notified."

For some reason, this letter was not received until a month later, although on July 21, 1966, when the Bank wrote EBSCO another letter, it quoted the above letter verbatim. The Bank also told EBSCO:

"We would prefer that your receipt be to our bank covering these books; but if that is not in line with your policy, we

3. The Uniform Commercial Code did not become effective in Alabama until midnight, December 31, 1966. Act No. 549, Acts of Alabama Regular Session 1965.

478

would want to know that you do recognize the assignment of your receipt by the American Southern Publishing Company which we hold. What we are trying to accomplish is that we want to know that these books will not be moved out except on order confirmed by us. Any suggestions to accomplish the above will be appreciated."

On July 19, 1966, the Bank was added as a loss payee to the Bankrupt's fire insurance policy.

By letter of August 15, 1966, the Bankrupt requested the State to make its payment warrants "payable to the First National Bank of Mobile, Alabama and the American Southern Publishing Company Escrow Account." The State agreed to comply with this request.

EBSCO wrote the Bank on August 19, 1966, inter alia:

"We hereby agree, to the extent we can legally do so, that we will not ship any more of said books from our warehouse without your consent."

Thereafter, the Bankrupt executed promissory notes payable to the Bank dated August 22, 26, 31, September 1, 2, 8, 14, 20, 27, and 30, 1966. The principal amount of these notes is in excess of $100,000.00. Each note contained the following printed words:

"THERE HAS BEEN DEPOSITED AND PLEDGED AS COLLATERAL SECURITY FOR THE PAYMENT OF THIS NOTE, OR ANY OTHER LIABILITY OR LIABILITIES OF THE UNDERSIGNED TO THE OWNER THEREOF, WHETHER THE SAME BE NOW EXISTING OR HEREAFTER CONTRACTED, NOW DUE, OR HEREAFTER TO BECOME DUE THE FOLLOWING PROPERTY BELONGING TO THE UNDERSIGNED TO-WIT: _____

_____

_____."

Six of the notes contained the following typed words in the above blank space:

"Books valued at $166,980.95 covered by Publishers' Warehouse Division of EBSCO Investment Services, Inc. receipt dated June 24, 1966. Copy of receipt attached hereto."

The note dated September 20, 1966,[4] contains the following typed words in the blank:

"Assignment in part of Invoice No. 16570 to State of Alabama for $6,537.48, less 8% due to be paid to Publishers' Warehouse, Division of EBSCO Investment Services Inc., when invoice is paid. Copy of invoice attached hereto."

The two notes dated August 31, 1966, originally contained these typed words:

"Reference to escrow account procedure in warehouse inventory value for collateral."

The note executed September 1, 1966, also contained this same wording. The Bank then wrote Bankrupt that it would like to have the typed-in wording in future notes to read:

"Books valued at $166,980.95 covered by Publishers' Warehouse Division of EBSCO Investment Services, Inc. receipt dated June 24, 1966. Copy of receipt attached thereto."

and that it had " * * * taken the liberty of inserting into these notes [August 31, 1966] assignment of these books." The September 1, note was changed to read:

"Publishers' Warehouse Division of EBSCO Investment Services, Inc. receipt dated June 24, 1966. Copy of receipt attached hereto."

Attached to all the notes, except the one executed September 20, 1966, is EBSCO's certified inventory dated June 24, 1966.

EBSCO apparently became dissatisfied with the burden placed upon it to seek the

---

4. The Bank does not claim the amount of this note.

Bank's approval (pursuant to its August 19 letter) for numerous small orders. Consequently, the Bank, Bankrupt, and EBSCO signed on September 12, 1966 the following "tri-partite" agreement, as suggested by the Bank, viz.:

"* * *

"Gentlemen:

"We are writing at Mr. Pharr's suggestion, as contained in his letter of August 31, 1966 to John Morrow, to set forth in one document, which can be signed by the Bank, American Southern and Publishers' Warehouse, the procedure which has been worked out for the handling of the textbooks of American Southern on hand in the Warehouse and for the distribution of proceeds derived from the sale of such textbooks. We have provided a place below for this letter to be signed by each of you.

"If it meets your approval, we suggest that American Southern sign the original and two copies, forward them to the Bank in Mobile for execution by it and that the Bank retain the original and return an executed copy to American Southern and to us.

"The procedure will be as follows:

"1. Shipment of textbooks on orders from authorized agents appointed by county or city boards of education and from school boards or systems, principals, school teachers, and individuals in the State of Alabama, payment for which is due to be made to the Warehouse, will be made by the Warehouse without prior approval of the Bank or American Southern.

"2. Approval of the Bank will be obtained by the Warehouse before making shipment of any textbooks payment for which is not due to be made to the Warehouse.

"3. The Warehouse will remit to the Bank any monies due American Southern at the time of each quarterly report to American Southern, less commissions then due the Warehouse for shipments made.

"Page 2

"September 12, 1966

"4. American Southern has directed and will cause the State of Alabama to remit to the Bank any monies due American Southern on account of the purchase of textbooks by the State of Alabama.

"5. The Bank will pay to the Warehouse 8% of the monies received by it on account of the purchase by the State of Alabama of textbooks from American Southern as the commission due the Warehouse under its agreement with American Southern.

"The procedure set forth above will continue in effect until the indebtedness of American Southern to the Bank and any accured interest thereon is discharged in full. * * *"

█ On the first appeal, three justices joined Justice Faulkner (the author) in holding:

"We are of the opinion that no valid pledge of the books to the Bank existed.

*    *    *    *    *    *

"From the record it appears that the financial arrangement between the Bank and American Southern was assignment of accounts receivable and therefore such assignment would be ineffective as against the creditors of American Southern. (Citations omitted) * * *"

Of course under our statute and the rule of our cases, this did not constitute a holding of the Court. See: Phoenix Insurance Company v. Stuart, 289 Ala. 657, 270 So.2d 792; Tit. 13, § 14, Code 1940, as last amended.

The main complaint of the Bank, on this appeal, is that the first opinion fails to distinguish between a pledge in which the personal property remains on the pledgor's premises and a pledge wherein the personal

property remains in the hands of a person who is neither the pledgor nor pledgee.

The Bank contends the following rules are applicable to its financing arrangement in this case:

"§ 8. CHATTEL IN POSSESSION OF THIRD PERSON.

"Where the chattel is in the possession of a third person a pledge may be created by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee.

\*   \*   \*   \*   \*   \*

"Comment:

\*   \*   \*   \*   \*   \*

"b. *Notification.* Unless otherwise agreed, there is notification of the pledge to the third person in possession of the chattel intended to be pledged

(a) when the pledgor or pledgee states the fact of the pledge to the third person orally or in writing delivered to him personally; \* \* \*

"Illustrations:

\*   \*   \*   \*   \*   \*

"4. A agrees with B that a chattel in C's possession is to be security for an indebtedness of A to B. B notifies C who refuses to acknowledge that B has an interest in the chattel. D attaches the chattel in C's possession. The pledge is valid and B has a pledge interest in the chattel, which is superior to D's interest.

\*   \*   \*   \*   \*   \*

"§ 11. RETURN OF CHATTEL TO PLEDGOR.

\*   \*   \*   \*   \*   \*

"(2) A pledge is not terminated by delivery of the chattel to the pledgor for a temporary and limited purpose relating to the maintenance of the value of the pledgee's interest and having to do with the \* \* \* sale of the chattel \* \* \*." American Law Institute, Restatement of the Law of Security (1941).

"The general rule is that the validity of a pledge is not affected by the fact that an agent or employee of the pledgor is made the custodian of the property if the parties agree to such arrangement and he is in fact placed in possession. \* \* \*" 41 Am.Jur. Pledge and Collateral Security § 20 (1942).

The Bank further contends that the right in a debtor to sell pledged collateral in the ordinary course of his business but with the creditor's prior approval does not invalidate a pledge so long as the proceeds are applied to payment of the debt, citing: Harrison v. Merchants National Bank, 124 F.2d 871 (8th Cir. 1942).

At the second trial, the Bank, in answer to statements made in this Court's first opinion, sought to show that its claimed "pledge" could be foreclosed under the provision of Tit. 9, §§ 9–12, Code of Alabama 1940 (Recompiled 1958), which provide upon default for sale of pledged property at public outcry. The Bank also offered "new evidence" of its claimed dominion and control of the books when the EBSCO warehouse manager testified that, by computer print out, the quantities and titles of books held by EBSCO in its warehouse for Bankrupt could have been determined and that had Bankrupt sought to remove the books from the warehouse he would not have allowed it to do so.

Although the authorities offered by the Bank do persuade us that a pledge valid against a lien creditor might have been created in the situation in which the parties found themselves in this case, after carefully considering both the "old" evidence and the "new" evidence, we remain unconvinced that the parties ever really intended to create a "pledge" of the books. Or, if they did, that they effectually carried out such intention.

It is apparent to us that the principal concern of the Bank was to secure the proceeds from the Bankrupt's state school textbook contracts. In the financing arrangements it made, the Bank does not ap-

pear to have been interested in preserving the books at the EBSCO warehouse in order that it might foreclose and sell the books at public outcry. To the contrary, every step taken by the Bank appears to us to have been for the purpose of insuring that the Bankrupt would perform its state contracts (contracts which only the Bankrupt itself could perform and which required the agency of EBSCO to effect) and that the State's payments would be made directly to the Bank. While the Bankrupt could not "assign" its contracts with the State, i. e., delegate its duty to perform, the Bankrupt could assign its right to payment. In other words, the books were of little value without the state contracts which only the Bankrupt could perform. If the Bank had "bought in" the books on foreclosure of its claimed "pledge," it could not have sold them to the State under the Bankrupt's contracts.

We are not unmindful of the fact that some of the form notes signed by Bankrupt use words of "pledge" with regard to the books. However, other notes speak of "assignment of invoice," "reference to escrow account procedure," and "Publisher's Warehouse * * * receipt dated June 24, 1966." When all the notes are considered together along with the "tri-partite" agreement, the parties' other correspondence, and their actions, we must conclude there was no valid pledge of the books created sufficient to defeat the Trustee's standing as a judgment lien creditor. At most, we would have to conclude that an assignment of Bankrupt's right to receive payment from the State on its contracts was effected by the parties.

The Alabama Accounts Receivable Act defines an account receivable as including " * * * a right to sums * * * to become due on * * * contracts." Tit. 39, § 207, Code of Alabama 1940 (Recompiled 1958). Under the Act, an assignment, to be valid against creditors of the assignor, must be in writing, made for value, and a "Statement of Assignment of Accounts Receivable" filed with the probate judge. Tit. 39, § 209, Code of Alabama 1940 (Recompiled 1958). The Bank did not file the required statement. Filing is declared by the act to be the exclusive method by which an assignee can perfect an interest in an account receivable against creditors of the assignor. Notification of the account debtor (the State), as was done in the instant case, is not sufficient for perfection. Tit. 39, § 213, Code of Alabama 1940 (Recompiled 1958).

It is thus that we hold: (1) that there was no "pledge" of the books by the Bankrupt to the Bank and, therefore, as of the date of bankruptcy, the Trustee was entitled to the books free from any priority claim by the Bank; (2) that the Bankrupt made an assignment to the Bank of the Bankrupt's right to payment from the State which assignment, as of the date of bankruptcy was unrecorded and, hence invalid as to the Trustee in Bankruptcy, thereby entitling the Trustee to the entire sales proceeds of the books.

The judgment of the trial court is affirmed.

Affirmed.

HEFLIN, C. J., and MERRILL, COLEMAN, HARWOOD, MADDOX, FAULKNER and JONES, JJ., concur.