James G. Humber brought an action against the B. F. Goodrich Company, William J. Misko, and James Shields, alleging breach of contract, misrepresentation, and other causes of action not pertinent here. The trial court entered summary judgment for the defendants, and Humber appeals.
The dispute concerns money paid by Humber to Shields in connection with Humber's hauling of scrap tires from Goodrich's Birmingham Product Service Department warehouse center. Humber contends that the money he paid Shields, 20% of the amount paid to him by Goodrich for hauling away tires, was represented to him as creating a cash bond to pay any expenses caused by Humber's improper dumping of tires, to be reimbursed if no claims were made on the bond. When he quit hauling tires, he wrote Shields, demanding reimbursement of his "Job Security Bond Money" in the amount of $26,276.10, but Shields denied any such liability. Shields, Goodrich, and Misko (Goodrich's area manager) assert that the money paid to Shields was a commission due by virtue of the fact that Shields had originally contracted with Goodrich to haul the tires.
The evidence is undisputed that in 1973, Shields entered into an oral contract with Curly Durham, Misko's predecessor as manager with responsibility over the disposing of scrap tires from the facility in *Page 513 
question. Shields agreed to haul away tires for specified payments depending on the number and kind of tires. Shields stated in deposition that he hired James Taylor to haul the tires. Under the initial arrangement, Goodrich made payments directly to Taylor, who paid Shields 10% of his receipts.
Misko took Durham's place around 1975 or 1976. Shortly thereafter, Taylor made arrangements with John O'Brien for O'Brien to take over the haulage. O'Brien stated in deposition that he paid Taylor $3000, which, according to O'Brien, represented reimbursement to Taylor for his bond money. O'Brien did not talk to Shields, however; the information about bond money came from Taylor. Taylor also gave O'Brien the truck he had been using; according to O'Brien, the truck was not worth $100 and he did not use it long. O'Brien's deposition indicates that Misko confirmed Taylor's representations that O'Brien would have to continue paying the "bond money." O'Brien also stated that Taylor and Misko told him that the money was supposed to cover any expenses caused by improper dumping.
O'Brien performed the hauling contract along with Benny Smith. At one time O'Brien complained to Misko about the 10% payment to Shields. O'Brien stated that Shields telephoned him the next day and said, "[W]e are going to jump this thing up to twenty percent and going to give you a raise"; O'Brien continued, "[D]umb as I was I fell for it, but I was actually losing money." Apparently, this was virtually the only time O'Brien and Shields talked, and there is no evidence that O'Brien asked Shields about the nature of, or the reason for, the payments.
In 1977, Humber started working with O'Brien and Smith. He stated in deposition that Smith left after about six weeks, that he paid Smith $3000, and that Smith told him that the $3000 represented Smith's share of the bond money. Humber and O'Brien performed the hauling contract for a few more months, after which Humber apparently paid O'Brien $3000 and O'Brien left the business. O'Brien told Humber that the $3000 represented O'Brien's share of the bond money and that he should continue making 20% payments to Shields, whom O'Brien described as being affiliated with Goodrich. Neither of them talked to Shields about the transfer to Humber of the hauling rights.
Both Humber and O'Brien stated in their depositions that Misko was aware, prior to Humber's payment to O'Brien of the $3000, that Humber was under the impression that the 20% payment was "bond money." Humber stated that O'Brien introduced him to Misko; his deposition continued:
 "Q. Well, did Mr. Misko approve of the fact that you were going to be hauling tires from then on?
 "A. Yes, sir. He asked Mr. O'Brien, 'Had you told him about the twenty percent?' And he looked at me. And I said, 'The bond money?' And he said, 'Yes.' He said — I said, 'Yes, sir, I am aware of that.' "
Humber took over the hauling operation in September 1977 and continued it until 1986. On several occasions he complained about the bond money. He testified that on such occasions Misko told him that he had to pay the money if he wanted to keep the job. Humber said that on one such occasion Misko offered to raise the price per tire for the hauling; that he replied that he would rather have the bond money reduced or stopped; and that Misko said he could not do that. Humber said that he talked to Shields only once, and that that was to tell him the payment would be late. Shields stated in deposition that he did not recall talking to Humber at all.
In 1981, the payment was dropped to 10%; Humber stated in deposition the following:
 "[T]hat was a year that I didn't — the first of the year, when I didn't get a raise. Usually I would get a few cents right after the first of the year raise. And that year Mr. Misko told me — said I got some bad news and I got some good. And he said I am not going to be able to give you a raise this year, but we are going to cut the twenty percent back to ten." *Page 514 
In 1982, Humber stopped making payments to Shields altogether. According to Humber's calculations, his initial payment of $6,000 plus his periodic payments then totalled $26,276.10. He said he told Misko that he felt like that was enough to cover any claims against the bond and that, if Goodrich insisted on the bond, he would rather obtain a bond from a bonding company. Shields stated in his deposition that someone at Goodrich (someone other than Misko) called him at that time to tell him that Humber was complaining about the payments and that he said just to cut them off.
In 1984 and 1985, there were some complaints about Humber's dumping of the tires, and Goodrich was dissatisfied with his lack of promptness in removing tires from the warehouse dock. There was no attempt to inform Shields about the problems, however, and Goodrich sustained no expenses due to the problems. Apparently because of the problems, Goodrich drafted a one-page "1985 Scrap Disposition Agreement," which was dated January 22, 1985, and was signed by Humber and Misko. The agreement covered Humber's responsibilities for removing tires, the compensation per tire, and the requirement that Humber remove the tires "on a daily or bi-daily basis, never allowing more than 600 units to accumulate." The agreement concluded: "Should any additional expenses occur after scrap units have been removed by [Humber] from our premises, the costs will be the responsibility of [Humber]. The agreement made no mention of either a bond or a commission; of course, the commission to Shields had been discontinued three years earlier.
Shortly thereafter, Goodrich merged with another tire company to become the Uniroyal Goodrich Company, and began sending most of the scrap tires to Tuscaloosa for incineration. Due to the decreased volume of business, Humber quit hauling tires in 1986.
When he resigned, Humber wrote a letter to Shields, with a copy sent to Misko, requesting a refund of the bond money. Misko wrote a letter to Humber that included the following:
 "Your letter to James Shields implied that I authorized your business dealings with him. Independent contractors are responsible for handling their own agreements with regard to services, expenses, etc. as you have done with your employees. Your agreements with Shields and your employees are beyond our interest in the removal of scrap tires."
After receiving that letter, Humber spoke to Shields by telephone, and Shields said that it had been his business all along and that he did not know what Humber was talking about in asking for a refund.
The evidence recited above would support a finding that Misko represented to Humber that the payments constituted some sort of "bond money," or at least failed to correct Humber when he referred to the payments that way, and that they were imposed to assure that money would be available to clean up any improper dump sites. Humber himself testified, however, that no one ever told him that the money would be refunded if it was not used for such a cleanup, but that that was simply his understanding or his belief. Furthermore, all of Humber's records referred to the payments to Shields as a 20%commission, and Humber had no documentary evidence of any bond toward which the payments were being made.
On appeal, Humber argues that he should have been allowed to proceed past the summary judgment stage on his theories of contract, fraud, and quasi-contract. Misko correctly points out that Humber's complaint does not seek relief under a quasi-contract theory. Issues not raised before a trial court may not be raised on appeal. Green v. Taylor, 437 So.2d 1259
(Ala. 1983); Hutchins v. Shepard, 370 So.2d 275 (Ala. 1979). Therefore, only the fraud and contract theories are before us.
None of the evidence in the record tends in the least to show a contract between Shields and Humber that would require Shields to refund to Humber any of the payments or to show any representations *Page 515 
by Shields to Humber at all, and certainly not one that would support an action for fraud. Nor can we find evidence of a contract between Humber and either Goodrich or Misko individually that would have required Goodrich or Misko to refund the payments made to Shields. Humber himself stated that no one ever told him that the "bond payments" would be refunded, but that he simply assumed that to be the case. A contract requires a meeting of the minds, Christian v. Rabren,290 Ala. 45, 273 So.2d 459 (1973), and there is no evidence in this record of any such agreement to refund to Humber any portion of the payments made to Shields.
The only aspect of Humber's contentions that even arguably supports a cause of action is the claim that Misko represented that the payments to Shields were "bond money," that they were intended to cover expenses of cleaning up any improper dumping, and that Humber must make those payments in order to keep the job. However, Humber's testimony about his conversations with Misko tends to show only that Misko at most made only vague and passing references to the payments as "bond money" or failed to correct Humber when he made such references. Such references could not support a fraud claim in light of the evidence, from Humber's own checks and records, that he contemporaneously referred to the money paid to Shields as a "commission." Even if we accept as true Humber's evidence that Misko said the payments were for cleanups, such representations were essentially true, because Shields, as the holder of the contract, would have been liable for any such expenses. While Misko might have been more forthcoming and explained the relationship with Shields more fully, there is no indication of a confidential relationship between Humber and either Misko or Goodrich. Given the undisputed evidence that Shields actually held the contract with Goodrich, we conclude that Misko had no duty to disclose to Humber that Humber was in fact working for Shields. Any misrepresentation about the nature of the relationship appears to have originated with Taylor and to have passed through O'Brien to Humber.
An action for fraud requires proof of a false representation of a material existing fact, reliance by the plaintiff, and damage. Smith v. J. H. Berry Realty Co., 528 So.2d 314 (Ala. 1988); Ala. Code 1975, § 6-5-101. The evidence in the record before us would not sustain a finding that Misko misrepresented any material facts to Humber.
For the foregoing reasons, the judgment is due to be, and it hereby is, affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX, ADAMS and STEAGALL, JJ., concur.