**Kenneth S. GALL, and Dolores M. Gall, Plaintiffs,**

v.

**AMERICAN HERITAGE LIFE INSURANCE COMPANY, INC., Defendant.**

**No. CIV.A.1:96–0366–RV–S.**

United States District Court, S.D. Alabama, Southern Division.

Jan. 26, 1998.

George L. Beck, Jr., Montgomery, AL, for plaintiff.

W. Michael Atchison, Starnes & Atchison, Birminghan, AL, for defendant.

## JUDGMENT

VOLLMER, District Judge.

In accordance with the court's January 26, 1998 order granting defendant American Heritage Life Insurance Co., Inc.'s motion for summary judgment, plaintiffs shall recover nothing from defendant. Pursuant to Federal Rule of Civil Procedure 58, judgment is hereby entered in favor of defendant American Heritage Life Insurance Company, Inc., and against plaintiffs Kenneth S. Gall and Dolores M. Gall. Each party shall bear its own costs.

## ORDER

This matter is before the court on the following documents:

1. Motion for summary judgment filed by defendant American Heritage Life Insurance Company, Inc., (doc. 14), together with a supporting brief, (doc. 15), and evidentiary materials (docs. 16, 18, & 21);

2. Response to the motion for summary judgment filed by plaintiffs Kenneth S. Gall and Dolores M. Gall (doc. 23);

3. Reply filed by defendant (doc. 26);

4. Plaintiffs' letter brief (doc. 29);

5. Defendant's "Notice of Filing Persuasive Authority" (doc. 30); and

6. The parties' joint pretrial document (doc. 31).[1]

After due consideration, the court finds that no genuine issue of material fact exists and that defendant is entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56. Accordingly, it is

**ORDERED that the motion for summary judgment is GRANTED.** The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. When this action was removed, (1) plaintiffs Kenneth S. Gall and Dolores M. Gall were Alabama citizens; (2) defendant American Heritage Life Insurance Company, Inc., was Florida corporation with its principal place of business in Florida; and (3) the amount in controversy exceeded $75,000.

2. Plaintiffs assert four causes of action against defendant American Heritage Life Insurance Company, Inc.—violation of ALA. CODE §§ 5–19–1 through 5–19–32 (the Mini–Code violation); fraudulent misrepresentation; fraudulent suppression; and civil conspiracy. (Parties' joint pretrial document).

3. On December 8, 1988, plaintiffs purchased an automobile from Wolff Motor Company in Evergreen, Alabama, and obtained a pre-computed interest loan from AmSouth Bank, N.A., to finance the purchase.[2] (Plaintiffs' Motor Vehicle Sale Installment Contract—"the contract"—ex. 1 to Howard Taylor dep.).[3] Both plaintiffs were signatories on the loan.

4. As set forth in the contract, the amount financed was $8,107.98. Pre-computed interest on the loan was $2,569.14, and the

---

1. As set forth on page 7 of the pretrial order (doc. 32), the parties were given the opportunity to submit additional briefing, but no additional briefs were filed.

2. In a pre-computed interest loan, the borrower agrees to pay the "total of payments," which is the sum of the "amount financed" plus all finance charges. At the initiation of the loan, the creditor determines the finance charges that will be earned over the entire period, and then adds that sum to the amount financed to arrive at the total the borrower must repay. Each month thereafter, the borrower must make a payment that equals the "total of payments" divided by the number of months in the transaction.

3. Mr. Taylor is defendant's vice president of credit insurance administration and compliance.

"total of payments" incurred by plaintiffs was $10,677.12.

5. In connection with the loan, and contained within the loan document, plaintiffs purchased credit life insurance [4] from defendant for Mr. Gall and paid a premium therefor in the amount of $427.08.[5] The premium for this insurance was calculated on the "total of payments" amount ($10,677.12), not on the "amount financed" ($8,107.98). (Taylor dep., p. 24).[6]

6. The fact that plaintiffs were purchasing credit life insurance was clearly disclosed in the contract. Moreover, the contract plainly informed the Galls that the credit life insurance was "optional" and "not required." In a block that is hard to miss, the contract sets forth the premium for the credit life insurance. Next to the printed statement "I want credit life insurance" is Mr. Gall's signature. Directly below the signature line is the description "Signature of Buyer to be insured." [7] (The contract; Kenneth Gall dep., pp. 47–49).

7. No representations of any kind were made to plaintiffs regarding the credit life insurance they purchased. More specifically, neither plaintiff discussed credit life insurance with anyone from Wolff Motors or American Heritage prior to entering into the contract and purchasing credit life insurance. (K. Gall dep., pp. 43–44, 53–54, 59–62; Dolores Gall dep., p. 6).[8] Thus, as Mr. Gall

---

4. Credit life insurance is term life insurance which provides death benefits in the event of an insured's death during the term of the coverage.

5. Also in the same contract, plaintiffs purchased disability insurance for Mr. Gall and paid a premium therefor in the amount of $416.40. Disability insurance provides monthly benefits in the event of an insured's disability during the term of coverage.

Although in their complaint (p. 3) plaintiffs obfuscate the two types of insurance at issue by defining credit life insurance to include disability insurance, in the parties' joint pretrial order they clearly limit the type of insurance at issue to credit life insurance. The distinction is critical. Although plaintiffs have an argument under *McCullar v. Universal Underwriters Life Ins. Co.,* 687 So.2d 156 (Ala.1996) (*opinion issued on reh'g*), that they were over-insured as to the credit life insurance, they do not have a valid over-insurance argument as to disability insurance. *See McCullar,* 687 So.2d at 164 (plurality op.), at 171, 174, 178 (Hooper, J., dissenting).

6. If the credit life insurance premium had been calculated on the "amount financed," the premium would heave been approximately 15% ($64) less than the premium calculated on the "total of payments." (Taylor dep., p. 41).

7. A similar block and signature line for disability insurance is directly below the credit life insurance block, and third block and signature line for "credit life and disability" insurance is directly below the disability insurance block. The record does not disclose why the parties used the first and second block instead using only the third block.

The three blocks are part of one large box which measures 3¾ inches x 3¾ inches.

8. Q. [By counsel for American Heritage] Was there any discussion of any kind that you can remember at the time that you bought the car shown in Exhibit No. 1 [the contract] about you purchasing credit life insurance?

A. [By Mr. Gall] No.
(K. Gall dep., p. 43).
Q. Did you ask any question to anybody at the time you signed this contract about why you were being charged $843.48 for insurance?
A. Not at that time, but I did the next day or two. Matter of fact, when I found it, I went and tried to get it canceled out right then and there.
Q. We're going to come to that. On that day of December 8, 1988, did you have any discussion with Mr. Wolff or anybody else about it?
A. No.
(K. Gall dep., pp. 53–54).
Q. Mr. Gall, as a matter of fact, Mr. Wolff didn't tell you anything about credit life that you relied on?
A. This is true.
Q. Y'all didn't mention it one way or the other, did you?
A. No, sir.
(K. Gall dep., p. 87.)
Q. Let's go to your house now. You've gotten this document out, Exhibit No. 1, and you're looking at it the next day, and you see you've been charged about $843.48 in credit insurance.
A. Right.
Q. What's the first thing you did?
A. I really couldn't believe it, to be perfectly honest. And then I went back out there and I told Pete [Wolff], I said, Pete, really I don't want this, I don't need it. He said, well, the contract's already gone, it's just gone. I said okay. I mean, what else was I going to do.
Q. That was the extent of it?
A. What was I going to do, beat him up, knock him in the head?
(K. Gall dep., pp. 59–60).
Q. Have we covered every conversation that you have ever had then with Mr. Wolff about this insurance policy?

admitted in his deposition, plaintiffs did not rely on any statement by Mr. Wolff or American Heritage regarding the credit life insurance. (K. Gall dep., pp. 63, 87).

8. Mr. Gall sold insurance for thirty years and was familiar with credit life insurance at the time he purchased such insurance from defendant on December 8, 1988, in connection with his automobile financing loan. (K. Gall dep., pp. 12 & 15).

9. Immediately after the contract was executed, defendant was obligated to pay the full amount of the credit life insurance policy purchased by plaintiffs in the event of Mr. Gall's death—that is, defendant was required to pay benefits to the creditor (AmSouth) equaling the full amount of the loan plus earned interest and to pay any additional benefit to the person(s) designated plaintiffs as the secondary beneficiary(ies) under the policy.[9]

10. When plaintiffs purchased the credit life insurance in question, ALA. CODE § 5–19–20(a) provided in pertinent part:

> Credit life and disability and involuntary unemployment compensation insurance may be offered and, if accepted, may be provided by the creditor. The charge to the debtor for any such insurance shall not exceed the authorized premium permitted for such coverages. Insurance with respect to any credit transaction shall not exceed the approximate amount and term of the credit.

11. The State of Alabama Banking Department, *through its administrator,* is authorized by ALA. CODE § 5–19–21(a) "to promulgate such rules and regulations and official interpretations (collectively "regulations") as may be necessary or appropriate for the execution and enforcement" of the Mini–Code.

12. Similarly, Rule 4(a) of the State of Alabama Insurance Department "provides that all insurance offered pursuant to [ALA. CODE] § 5–19–20 must comply with the De-

partment's rules and regulations." *McCullar v. Universal Underwriters Life Ins. Co.,* 687 So.2d 156, 162 (Ala.1996) *(opinion issued on reh'g ).*

13. Regulation No. 28 provided, in pertinent part:

> The amount of Group Life Insurance written under one or more certificates, issued by or through the same creditor, shall not exceed the original face amount of the specific contracts of indebtedness in connection with which it is written; provided, however, that where the indebtedness is repayable in substantially equal installments the amount of insurance shall never exceed the approximate unpaid balance of the loan.

14. From at least 1981 until legislative amendments to the Mini–Code in 1996, the Banking Department and the Insurance Department expressly interpreted ALA. CODE § 5–19–20(a) and Regulation No. 28 to permit, in pre-computed interest loan transactions, calculation of credit life insurance premiums based on the "total of payments" rather than on the "amount financed."

> "The [Banking] Department has consistently interpreted the phrase 'amount and term of credit' [in ALA. CODE § 5–19–20(a) ] to be the total of payments in the context of a[n] add on/precomputed interest credit transaction.... The state departments [Banking and Insurance] that regulate this activity have consistently interpreted the controlling law and regulations so as to permit and authorize that the amount of credit life insurance and the credit life premiums be calculated based upon the 'total of payments' in the context of a[n] add on precomputed credit transaction."

*McCullar,* 687 So.2d at 174 (Hooper, J., dissenting) (quoting State of Alabama Banking

---

A. Yes.

(K. Gall dep., p. 62).

**9.** In the event that Mr. Gall died and there existed any insurance benefits above and beyond that needed to pay off the Galls' debt, such benefits

would have gone to Mr. Gall's secondary beneficiary or to his estate. In no event would the additional benefits have reverted to defendant. (Taylor dep., pp. 19–20. *See also* Wolff Motor Companies Group Credit Life Insurance Policy (ex.9 to Taylor dep.)).

Department *amicus curiae* brief). *See also McCullar*, 687 So.2d at 162 (plurality op.).[10]

15. Thus, defendant's calculation of plaintiffs' credit life insurance premium based on the "total of payments" was a method that had been authorized by the two state agencies under a duty to interpret the controlling law.

16. Defendant relied upon the positions of the Banking Department and the Insurance Department in providing credit life insurance which provided benefits equaling the "total of payments" in thousands of pre-computed interest transactions in Alabama, including that with plaintiffs. (Taylor aff., ¶¶ 2 and 3).

### CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(b).

2. As the Court of Appeals for the Eleventh Circuit cogently explained:

> Summary judgment is proper in cases in which there is no genuine issue of material fact. Fed.R.Civ.P. 56(c)....[The court] must view all of the evidence in the light most favorable to the non-moving party. *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988). The movant bears the initial burden of presenting evidence sufficient to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When the movant has met its burden, the nonmovant must then designate, by affidavits, depositions, admissions, and answer to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir.1995).

*Southern Solvents, Inc. v. New Hampshire Ins. Co.*, 91 F.3d 102, 104 (11th Cir.1996). Further,

> An issue of fact is "genuine" if the record as a whole could lead a rational trier of

fact to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if it might affect the outcome of the case under the governing law. *Id.*

*Bennett v. United States*, 102 F.3d 486, 488 (11th Cir.1996).

3. All of plaintiffs' causes of action arise out of a single act of defendant which plaintiffs allege violated ALA. CODE § 5–19–20(a) and Insurance Regulation No. 28—defendant's calculation of the credit life insurance premium based on the "total of payments" rather than on the "amount financed."

4. Plaintiffs' case is founded upon the Supreme Court of Alabama's November 22, 1996 opinion issued on rehearing in *McCullar*, 687 So.2d 156 (Ala.1996). In *McCullar*, the plaintiff claimed that she was defrauded because a representative of an automobile dealership told her that credit life insurance coverage based on "total of payments" was the amount "needed" to pay off the loan in the event of death. *McCullar*, 687 So.2d at 160 (plurality op.).

The *McCullar* defendants argued that their practices were authorized by the Banking and Insurance Departments and, therefore, could not be fraudulent. To support their argument, defendants filed an affidavit of an employee of the Banking Department and an affidavit of a representative of the Insurance Department. *Id.* at 162. Both affiants attested that selling "total of payments" insurance coverage in pre-computed interest transactions was in accord with the Mini–Code and all other applicable Alabama law. *Id.* The trial court accepted the defendants' argument and granted their motions for summary judgment.

Reversing, a plurality of the state supreme court justices held that providing credit life insurance in pre-computed transactions calculated on the "total of payments" (rather than the "amount financed") violates "the plain meaning" of ALA. CODE § 5–19–20(a)

---

10. In addition, "total of payments" coverage in pre-computed interest transactions is expressly permitted in the majority of states and is sanctioned by the Uniform Consumer Credit Code

and model legislation promulgated by the National Association of Insurance Commissioners ("NAIC"). (*See McCullar*, 687 So.2d at 181) (Hooper, J., dissenting).

and Regulation No. 28. *Id.* at 164. The *McCullar* plurality also stated that their opinion should be applied retroactively. *Id.* at 166.

5. No single opinion in *McCullar* commanded five votes. Because *McCullar* was decided only by a plurality (three justices), it does not constitute binding precedent under that court's own rules and caselaw.[11]

6. Although the meaning of the statute and regulation may be "plain" to the three-justice plurality, it is not plain to this court, primarily because one of the frequent results of the plurality's interpretation thereof would be the under-insurance of the insured. *See McCullar*, 687 So.2d at 178 (Hooper, J., dissenting).

7. Even if this court agreed with the *McCullar* plurality on the statutory interpretation issue, this court will not follow the plurality's decision to apply its interpretation retroactively. As Justice Hooper summarized in his dissent:

> [T]he method used by [the defendant insurance company] to determine [the credit life insurance] premium has been the common business practice of insurers not only in the State of Alabama, but also throughout the country. It is a business practice that was approved by the State of Alabama Banking Department and the State [of Alabama] Insurance Department, the very agencies charged with interpreting the state statute the plurality uses to call into question the insurance provided by [the defendant insurance company]. It is a business practice that has been accepted as a legitimate method of accounting for credit life insurance in at least 42 states of this country and approved in their statutes and by their regulatory agencies. The amount

of the insurance was disclosed to the [plaintiffs] at the time of the purchase; there was nothing hidden or concealed from them when they purchased the case and the amount of credit insurance necessary to cover the purchase. The amount insured was what was needed from this kind of contract.

\* \* \* \* \* \*

> One day [the defendant insurance companies] were engaged in a legitimate business practice. The next day [following the issuance of the *McCullar* plurality decision] they woke up to learn they were engaged in fraud.

*McCullar*, 687 So.2d at 167–68 (Hooper, J., dissenting).

8. Retroactive application of the *McCullar* plurality's interpretation raises serious due process concerns, as observed by Justice Maddox in his dissenting opinion:

> The facts clearly show that the defendants relied upon administrative interpretations made by the State Insurance Department and the State Banking Department of Alabama's "Mini–Code," specifically, § 5–19–20(a), Ala.Code 1975, in administering credit sales involving insurance. Although these administrative interpretations may have been incorrect, the language of the statue itself is arguably ambiguous. The effect of today's decision is that a defendant can be punished for conduct that conformed to the interpretation of § 5–19–20(a), Ala.Code 1975, given by two separate state agencies.

> One of the hallmarks of justice and fair play is that those performing a statutorily regulated activity should have the right to reply upon the interpretation of a state

---

11. Ala.R.App.P. 16(b) states:

*Concurrences necessary.* The concurrence of five justices in the determination of any cause shall be necessary and sufficient thereto, except when, by reason of disqualification the number of justices competent to sit therein is reduced, in which event the concurrence of a majority of the justices sitting shall suffice; but, in no event, may a cause be determined unless at least four justices sitting concur therein.

"When less than a majority of the court concurs in an opinion, no disqualification existing, the

statements of law and application of the law to the facts contained in t… opinion are not the law of the case. The opinion stands solely for the result of the case, either affirmed or reversed." *Alabama State Tenure Commission v. Mt. Brook Bd. Of Education*, 343 So.2d 522, 527 (Ala.1976) (Bloodworth, J., dissenting). *See also First National Bank of Mobile v. Bailes*, 293 Ala. 474, 479–80, 306 So.2d 227, 231 (1975); *Phoenix Insurance Company v. Stuart*, 289 Ala. 657, 270 So.2d 792 (1972); *Gulf American Fire & Casualty Company v. Gowan*, 283 Ala. 480, 218 So.2d 688 (Ala.1969).

agency charged with the responsibility of administering the state regulatory scheme. This principle of justice and fairness is even more pronounced when conduct of a party could subject the party to a penalty or some other punishment. As the United States Supreme Court recently stated: "Elementary notions of fairness enshrined in this Court's constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *BMW of North America, Inc. v. Ira Gore,* 517 U.S. 559–60, 116 S.Ct. 1589, 1591, 134 L.Ed.2d 809 (1996).

Id. at 195–96 (Maddox, J., dissenting) (other citations omitted).

9. Free of any moorings to the *McCullar* plurality opinion, this court will defer to the interpretation of ALA. CODE § 5–19–20(a) by the Banking and Insurance Departments:

The interpretation placed on a statute by the executive or administrative agency charged with its enforcement is given great weight and deference by a reviewing court. *Alabama Metallurgical Corp. v. Alabama Public Service Comm'n,* 441 So.2d 565 (Ala.1983); *Hulcher v. Taunton,* 388 So.2d 1203, 1206 (Ala.1980); *Employees' Retirement System v. Oden,* 369 So.2d 4 (Ala.1979); *Moody v. Ingram,* 361 So.2d 513 (Ala.1978). "[T]he interpretation of an agency regulation by the promulgating agency carries " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *United States v. Larionoff,* 431 U.S. 864, 872 [97 S.Ct. 2150, 2155, 53 L.Ed.2d 48] (1977) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 [65 S.Ct. 1215, 1217, 89 L.Ed. 1700] (1945))." *Brunson Constr. & Environmental Services, Inc. v. City of Prichard,* 664 So.2d 885, 890 (Ala.1995).

*McCullar,* 687 So.2d at 163 (plurality op.) (brackets in the original).

■ 10. Furthermore, the agency's interpretation is not required to be the only reasonable interpretation or one that the reviewing court "would have reached had the question arisen in the first instance in judicial proceedings." *Kruse v. Hampton,* 394

F.Supp. 764, 769 (S.D.Ala.1974), *aff'd,* 513 F.2d 1231 (5th Cir.1975). Rather, the agency's interpretation need only be "a permissible construction of the statute" to be upheld. *Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–93, 81 L.Ed.2d 694 (1984).

■ 11. Deference to the enforcement agencies' interpretation of a statute is especially warranted where, as here, "the longstanding interpretation has controlled how the public has conducted its business." *City of Birmingham v. AmSouth Bank, N.A.,* 591 So.2d 473, 477 (Ala.1991).

12. As previously noted, the State Banking and Insurance Departments have been given the responsibility to issue rules and interpretations regarding the Mini–Code in particular and credit insurance in general.

13. As previously noted, defendant knew of and relied upon these agency interpretations. (Taylor aff., ¶¶ 3 & 4).

14. Additionally, there is nothing arbitrary or "plainly erroneous" in the positions taken by the Banking Department and the Insurance Department. The same position is also endorsed in the Uniform Consumer Credit Code, the model legislation from which much of the Alabama Mini–Code and the comparable laws of other states were patterned. *See* UCCC §§ 2.105(7) and 3.107(2) ("A sale, refinancing, or consolidation is 'pre-computed' if the *debt* is expressed as a sum comprising the principal and the amount of the loan finance charge computed in advance."); UCCC § 4.202(1)(a) (Amount of Insurance)("in the case of consumer credit insurance providing life coverage, the amount of insurance may not initially exceed the *debt* and, if the debt is payable in installments, may not at any time exceed the greater of the scheduled or actual amount of the debt...."), *reprinted* in 2 CCH *Consumer Credit Guide* ¶¶ 5045, 5267 and 5292.

15. Indeed, "the overwhelming majority of the states in this country (at least 42) allow for the 'total of payments' method of calculating the amount of insurance needed." *McCullar,* 687 So.2d at 181 (Hooper, J., dissenting).

16. The court concludes that at the time plaintiffs purchased credit life insurance from defendant in the pre-computed interest loan contract, defendant's calculation of the premium based on the "total of payments" was lawful under the controlling law as interpreted by the two state agencies charged with interpreting that law, and that therefore, defendant's calculation of plaintiffs' premium was not a violation of the Mini–Code. Accordingly, defendant is entitled to judgment as a matter of law with respect to plaintiffs' Mini-code violation.

17. Plaintiffs allege that defendant is guilty of fraudulent misrepresentation and suppression because defendant

represented to the plaintiffs that the amount of credit life insurance sold was the amount needed or allowed, the defendants were authorized to sell plaintiffs the amount of credit life insurance purchased and that the defendants failed to disclose to plaintiffs that the amount of credit life insurance sold was more than was needed to pay off the balance of the loan and was in violation of the Alabama Mini–Code.

Compl. ¶ 14.

18. Before plaintiffs may recover under their fraudulent misrepresentation claim, they must prove (1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result. *Baker v. J.R. Bennett*, 603 So.2d 928, 935 (Ala.1992) (citation omitted).

19. It is axiomatic that a plaintiff cannot recover on a fraud claim when "there is no evidence of a false statement," *Lake Martin/Ala. Power Licensee Ass'n, Inc. v. Ala. Power Co., Inc.*, 547 So.2d 404, 408 (Ala. 1989). *Accord, Humber v. B.F. Goodrich*

Co., 561 So.2d 511, 515 (Ala.1990) ("An action for fraud requires proof of a false representation"); *Wilson v. Brown*, 496 So.2d 756, 759 (Ala.1986) ("A false representation is one of the essential elements of fraudulent misrepresentation."), or reliance on the false representation. *Harmon v. Motors Ins. Corp.*, 493 So.2d 1370, 1373 (Ala.1986).

20. Contrary to the allegations in their complaint, plaintiffs testified that they did not discuss credit life insurance with anyone prior to their execution of the contract. There being no discussion regarding the credit life insurance policy or premium with defendant or its agent, there can be no false representation.[12] Likewise, without a false representation, there can be no reliance on the part of the plaintiffs as they have admitted. Accordingly, defendant is entitled to judgment as a matter of law with respect to plaintiffs' fraudulent misrepresentation claim.

21. Before plaintiffs may recover under their fraudulent suppression claim, they must prove (1) that the defendant had a duty to disclose [a material] fact, (2) that the defendant concealed or failed to disclose that fact, (3) that the concealment or failure to disclose induced the plaintiff to act, and (4) that the action cause injury to the plaintiff. *J.R. Bennett*, 603 So.2d at 934–35 (Ala.1992) (citations omitted).

22. Plaintiffs' "failure to disclose" allegation (suppression allegation) "that the amount of credit life insurance sold was more than was needed to pay off the balance of the loan and was in violation of the Alabama Mini–Code," (compl.¶ 14), has some superficial appeal. The contract does not disclose

---

12. The only representations in the contract regarding the credit life insurance are (1) that the insurance is optional; (2) that it is "for the Term of this Contract"; (3) that the premium is $427.08; and (4) that the premium is included in the "amount financed." All of these representations are true.

There is no representation (fraudulent or not) in contract which indicates how the credit life insurance premium was calculated—that is, whether it was calculated on the "total of payments" figure or on the "amount financed" figure. Moreover, because the insurance rate is not

included in the loan contract, a reader could not determine, through a couple of simple calculations, which of those two figures formed the basis of the premium.

Accordingly, there are no written fraudulent representations in the contract upon which plaintiffs can base their fraudulent misrepresentation claim. In any event, because plaintiffs did not read the contract prior to its execution (*see* ¶ 23, p. 16), any fraudulent misrepresentation claim based on the written contract fails for lack of reliance thereon by plaintiffs.

that the credit life insurance premium is calculated on the "total of payments," it does not disclose the rate of insurance, and it does not inform the purchaser that insurance calculated on "total of payments" could, depending on future events, result in the amount of insurance exceeding the amount of total debt. The suppression allegation appeal is lost, however, because plaintiff cites no authority which required defendant to disclose the basis of the premium calculation, the possibility of over-insurance, or the insurance rate.

23. Even if the court assumes that defendant was under a duty to disclose that information, plaintiffs have produced no evidence that defendant's concealment or failure to disclose that information induced plaintiffs to act.[13] In fact, Mr. Gall testified that at the time he executed the contract he did not realize that he, a person with 30 years in the insurance business, had purchased credit life insurance *because he did not read the contract* (even though he was afforded the opportunity to do so and was aware of the legal significance of the contract). (K. Gall dep., pp. 43, 44, 46, 54, 84). Under these circumstances, disclosure in the contract of the basis of the premium calculation, the possibility of over-insurance, or the insurance rate would have been a useless and futile act by defendant even if it had been under a duty to make that disclosure. Inasmuch as Mr. Gall did not realize that he was purchasing insurance, the basis of the premium calculation, the possibility of over-insurance, and the insurance rate could not have been material to him, nor could the non-disclosure of that information have induced plaintiffs to act.

24. Plaintiffs' argument that defendant suppressed the fact "that the amount of credit life insurance sold was ... in violation of the Alabama Mini–Code" fails because the amount of the insurance sold did not violate the Mini–Code, for calculating the credit life insurance premium on the "total of payments" was lawful practice.

25. Accordingly, defendant is entitled to judgment as a matter of law with respect to plaintiffs' fraudulent suppression claim.

26. Finally, plaintiffs assert that defendant and/or AmSouth Bank and/or Mr. Wolff civilly conspired to violate the Mini–Code.

27. "A civil conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. The gist of the action is not the conspiracy alleged, the wrong committed."

*Lake Martin/Ala. Power Licensee Ass'n, Inc., v. Ala. Power Co., Inc.*, 547 So.2d 404, 409 (Ala.1989) (quoting *O'Dell v. State [ex rel. Patterson]*, 270 Ala. 236, 117 So.2d 164 (1959)).

28. The court's conclusion that defendant did not violate the Mini–Code defeats plaintiffs' civil conspiracy claim, and defendant is entitled to judgment as a matter of law with respect to that claim.

### CONCLUSION

Defendant is entitled to judgment as a matter of law as to all of plaintiffs' claims. In accordance with Federal Rule of Civil Procedure 58, judgment will be entered by separate document.

---

**13.** Mr. Gall's testimony that he relied on Mr. Wolff not to sell the Galls "any more credit life insurance than necessary to pay off [their] indebtedness," (K. Gall dep., p. 85), is completely refuted by his testimony that he did not discuss any type of insurance with Mr. Wolff (much less an amount of insurance coverage) and that he did not read the contract and therefore did not realize that he was purchasing insurance of any kind.